

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

### NO.AP-75,604

### JUAN RAMON MEZA SEGUNDO, Appellant

v.

### THE STATE OF TEXAS

### ON DIRECT APPEAL
### FROM TARRANT COUNTY

COCHRAN, J., delivered the opinion of the unanimous Court. PRICE, J., filed a concurring opinion in which MEYERS and HOLCOMB, JJ., joined.

## **O P I N I O N**

Appellant was convicted in December 2006 of capital murder for raping and strangling Vanessa Villa.[1] Pursuant to the jury's answers to the special punishment issues, the trial judge sentenced appellant to death.[2] Direct appeal to this Court is automatic. We have reviewed appellant's nineteen points of error, and, finding them without merit, we

---

[1] Tex. Penal Code §19.03(a).

[2] Tex. Code Crim. Proc. art. 37.071 §2(b), (e), and (g).

affirm the trial court's judgmen and sentence.

## Factual Background

This "cold case" prosecution involved the 1986 rape and murder of eleven-year-old Vanessa Villa. Appellant was not a suspect until 2005 when, during a routine CODIS[3] computer run, his DNA profile "matched" that from sperm found in Vanessa's vagina.

Vanessa lived with her mother, Rosa Clark, her one-year-old brother, Enrique, her aunt, Alicia Avila, and her aunt's three children in a small house in northwest Fort Worth. On August 2, 1986, Vanessa came home at about 5-6 p.m. after working at a flea market. She fell asleep, fully clothed, in the bedroom that she shared with her mother and baby brother. At about 10 p.m., her mother and aunt left to run some errands. When they returned an hour later, Rosa went into her bedroom, and she "hollered" to Alicia. When Alicia came into the bedroom, she saw a comatose Vanessa lying on the bed. Her blouse and bra were pushed up, she was naked from the waist down, and her bare legs were slightly separated. The window fan was on a bedroom chair and the window screen was hanging loose. Alicia saw what she thought was semen on Vanessa's legs.

They called the police. Vanessa was taken to the hospital, but she was pronounced dead shortly thereafter. According to the medical examiner, the cause of her death was manual strangulation. Vanessa also had abrasions and bruises on her face consistent with a hand pushing down on her mouth and nose. There was muddy debris on her thighs,

---

[3] CODIS is the acronym for Combined DNA Index System.

consistent with a hand grabbing her thigh, abrasions on her left breast, and a bruise on her right arm. She had a "huge tear" on the back wall of her vagina, and there was blood around her external genitalia. The medical examiner thought that these injuries were "perimortem"–caused right around the time she died. Sperm was found on the bedspread, the fitted sheet she was lying on, and in Vanessa's vagina. The medical examiner agreed that sperm can remain in the vaginal vault for anywhere from 48-72 hours.

Although the Fort Worth police investigated several possible suspects, three of them were eliminated when their DNA profiles did not match the DNA from the crime scene semen samples, and the investigation of other suspects led nowhere. Vanessa's rape and murder eventually became an unsolved "cold case."

In 2000, a DNA blood sample was taken from appellant.[4] His DNA profile was entered in the Texas CODIS computer database. In March 2005, a DNA profile from the semen samples taken from Vanessa was also entered into the CODIS system. Two days later, a routine "search and match" computer test matched appellant's DNA profile with that of the semen. A verification test was performed the next month. Another DNA specimen was obtained from appellant, and, once again, his DNA matched that found in Vanessa's vagina and on her bedspread. The odds of another random DNA match to some other person were astronomical because appellant has a rare micro-allele in his DNA.

Although appellant had never been a suspect in Vanessa's rape and murder, he did

---

[4] The jury was not informed that appellant's blood sample was taken in prison pursuant to statute.

know her family.  Vanessa's mother and aunt worked with appellant's wife at a nursing home.  Appellant would sometimes drive his wife over to Rosa's home.  Alicia remembered that he had attended Vanessa's wake and had signed the guest book.

During the guilt phase, the State offered evidence of a second rape-murder appellant committed in 1995.  During the punishment phase, the State offered evidence of a third rape-murder appellant committed in 1994.  In both of these cases, the women were strangled, and semen containing appellant's DNA profile was found in the victims' vagina or mouth.

Other evidence at the punishment stage showed that, in 1987, appellant burglarized the home of Irene Perez by entering her bedroom through an open window one night.  He grabbed her, hit her face, choked her, and covered her mouth.  She thought she was going to die, but she fought him off, turned on the light, and recognized him as someone she used to work with.  He did not have his pants on.  He escaped and fled in a small black car.

Three years later, appellant burglarized Sandra Holleman's apartment, coming in through a living-room window, as she and her two small children were asleep on a mattress in the living room.  Ms. Holleman woke up to see appellant lying naked beside her, trying to pull her pants down.  As she screamed, he tried to choke her.  He escaped by climbing back out the living-room window.  She thought that she recognized him as someone who had once lived in the same apartment complex.

The State also offered evidence that appellant repeatedly molested his girlfriend's five-year-old daughter in the late 1980's. When he babysat her, he would buy her candy and

then make her give him oral sex. Afterwards, appellant said that if she ever told her mother he would kill her and her mother. She was too afraid to tell her mother what appellant had done until she was sixteen years old.

Other evidence showed that appellant was arrested in 1993 when an officer saw him and another man pointing guns at each other on a Fort Worth street at 2:00 a.m. Appellant's gun, a Larcin semi-automatic, was loaded with one round in the chamber and six more in the magazine. While appellant was in prison in 1998, guards found four metal rods, in the process of being sharpened into "shanks," in the cell occupied by appellant and another man.

During the defense punishment case, appellant's brother, Val Meza, testified that appellant and his two brothers grew up in "a ghetto area" of El Paso. They moved from California with their mother because appellant's father physically abused their mother. They were very poor and had to scavenge for food when their mother disappeared for days at a time. Appellant fell down some stairs when he was about one, but he did not receive medical attention for that injury. Appellant seemed "slow" and "always in a daze" after that. Shortly thereafter, appellant and his brothers were taken to an orphanage, but they were eventually reunited with their mother, who remarried in 1967. Three years later, they moved to Fort Worth with their mother and stepfather, who was a physically abusive alcoholic.

Mr. Meza testified that appellant called him in 2000 from a halfway house and asked if he could stay with him. When Mr. Meza went to pick appellant up, he didn't recognize his brother, he "looked so broken down and so pitiful." Mr. Meza took him in on certain

conditions, including attending church and getting a job. Appellant got a job, got married, and re-established a relationship with his son, Joe Segundo, whom he had not seen since 1982.[5] One of appellant's employers, the director of a non-profit church entity, testified that appellant turned his life around after 2000. Several other witnesses also testified that appellant was now a "good person," a faithful member of his church, and sincere in making personal changes.

A clinical neurologist, Dr. Hopewell, testified that appellant's "extensive history of inhalant abuse" and his failure to have "a stimulating background upbringing" may have caused significant brain dysfunction. Appellant's IQ tested at 75, and his memory is impaired, but he is not mentally retarded. Dr. Hopewell stated that appellant had "very poor" insight, "poor" judgment, and "significant difficulty" with executive functioning.

The jury found appellant guilty of capital murder, and, in accordance with their answers to the special issues at the punishment stage, the trial court sentenced him to death.

## A.    Admission of the Extraneous Murder at the Guilt Stage.

In his first point of error, appellant claims that the trial judge erred in admitting evidence of Maria Navarro's rape and murder in 1995 because it "was not committed in a manner sufficiently similar so as to be a 'signature' offense," and the charged offense was too remote in time from that crime. Appellant also argues that this evidence should not have

---

[5] In rebuttal, the State called Joe Segundo's mother, appellant's first wife, who testified that, in 1981, appellant used to hit her with a boot, belt, or his fists, and he kicked her when he was angry. At least twice he put his hands around her neck and threatened to kill her. Once he cut her with a kitchen knife. But when she saw him again after 2000, he was a completely different person.

been admitted because appellant's identity as the person who both sexually assaulted and strangled Vanessa Villa was not undermined by his cross-examination of the State's DNA experts. Based solely on the cold record, we do not think that appellant's identity was seriously contested.[6] However, appellant argued at the jury-charge conference that he was entitled to instructions on the lesser-included offenses of aggravated sexual assault and murder because his cross-examination had raised an issue concerning the identity of the murderer;[7] therefore, we must agree that identity was disputed.

How strongly must identity be disputed before uncharged misconduct may be admissible? The trial judge has considerable latitude in determining that identity is, in fact, disputed.[8] It may be placed in dispute by the defendant's opening statement or cross-

---

[6] The State argues that appellant, during cross-examination, tried to undermine the evidence that he had both raped and killed Vanessa by suggesting the possibility that (1) the blood card sample sent to CODIS might not have come from appellant; (2) there was something suspicious about the State's failure to conduct DNA tests on material found under Vanessa's fingernails; (3) it was possible that the vaginal, anal, and mouth swabs had been packaged together thus allowing for cross-contamination; (4) Vanessa's bed sheet had not been examined properly; (5) it was possible that some unknown sperm, as well as appellant's, was on the bed sheet; (6) the DNA material might not have been stored properly; (7) other possible suspects had been considered before appellant's DNA was matched from the crime scene; and (8) sperm could remain in the vagina for up to 72 hours.

[7] Appellant argued that the jury should be instructed on the lesser-included offenses, in part because "not through one but two separate witnesses, there has been testimony elicited that seminal fluid or semen in a vaginal area could have been present as little as one minute prior to death or all the way up to 72 hours or three days." The defense position was that it was within the realm of possibility that appellant could have sexually assaulted Vanessa at some point up to 72 hours before her murder, and therefore it was possible that someone else later murdered her.

[8] *Page v. State*, 137 S.W.3d 75, 78 (Tex. Crim. App. 2004); *Lane v. State*, 933 S.W.2d 504, 519 (Tex. Crim. App. 1996).

examination, as well as by affirmative evidence offered by the defense.[9]

> That the impeachment was not particularly damaging or effective in light of all of the evidence presented is not the question. The question is whether impeachment occurred that raised the issue of identity. If so, Rule 404(b) permits the introduction of extraneous offenses that are relevant to the issue of identity.[10]

Although it is a close call, we conclude that the trial judge did not abuse her discretion in finding that appellant raised the issue of identity through his cross-examination.[11]

After the prosecutors presented their case-in-chief witnesses, they asked the judge to

---

[9] *See, e.g., Powell v. State*, 63 S.W.3d 435, 439 (Tex. Crim. App. 2001) (trial court has discretion to admit extraneous-offense evidence to rebut a defensive theory raised in the defendant's opening statement); *Page*, 137 S.W.3d at 78 (identity may be raised by cross-examination).

[10] *Page*, 137 S.W.3d at 79 ("The question of whether defense counsel's cross-examination of the victim raised the issue of identity may best be answered with another question: If it was not about identity, what was it about? Defense counsel did not offer the trial court an alternative explanation for his line of questioning, and none is apparent. Counsel simply denied making identity an issue.").

[11] The issue of identity was the primary focus of the defense closing arguments. Counsel noted that there had been six other suspects in this murder investigation, but that the State had not adequately explained why they became suspects or why they were eliminated. "You deserve this before someone can ask you to go back and make a decision about this." The defense also argued that "[a]t least based on DNA, there was another person's semen on the bedspread in that Villa bed and on the fitted sheet." The defense repeatedly stressed that

> even if you assume the DNA is solid, a done deal, what says and tells us that it has to be done at the time this young lady was strangled? . . .
> . . . It has to be an intentional killing and sexual assault. So even if you believe the DNA without any reservation, without any reasonable doubt, that's half the equation.
> . . . You've got to find that they were both done together before you can find him guilty of capital murder.
> And you're not asked to determine whether Juan Segundo is guilty of aggravated sexual assault of a child. If you believe the DNA wholeheartedly, 100 percent without question, that's not an issue before you. You are to decide these two parts here.

allow evidence of two extraneous rape-murders, one committed in 1994 and the other in 1995, in which appellant's DNA profile matched that found in semen in those victims. The prosecutor relied upon "the doctrine of chances" and *Rex v. Smith*,[12] the famous "Brides in the Bath" case:

> Both of these individuals were found naked; both of them, there are no witnesses to their homicide; both of them occurred in Fort Worth. These are adult females.
> And in both of them, there was a unique feature that makes this a signature-type offense, and that is that each of them at each of these scenes from the orifices of those individuals, a genetic profile was obtained. And that genetic profile is identical to the genetic profile of this Defendant.

The prosecutor noted that the State was required to prove both that appellant killed Vanessa Villa and that he did so in the course of committing sexual assault. This was the very issue that appellant disputed through his cross-examination. Thus, evidence that appellant's DNA profile was found in two other women who were victims of rape-murder was highly probative of connecting the sexual assault of Vanessa temporally with her murder. According to the prosecutor, "[t]he unlikelihood of Defendant's semen appearing in three different homicide scenes . . .the improbability of that is, on its face, obvious, and in itself probative of a fact that the State is obligated to prove."

The trial judge, exercising her discretion under Rule 403,[13] allowed the State to offer evidence of the rape-murder of only one of these women, Maria Navarro. She noted that the

---

[12] 11 Crim. App. 229 (1915) (Eng.).

[13] TEX. R. EVID. 403.

specific circumstances surrounding that offense were more similar to those in the present case than the circumstances surrounding the rape-murder of the third victim.[14]   The defense both objected[15] and requested a limiting instruction, which the trial judge gave.

The State then offered evidence that the body of a woman, later identified as thirty-two-year-old Maria Navarro, was found in Buck Sansom Park on the north side of Fort Worth in June 1995.  The woman was naked from the waist down, and her legs were spread apart.  She had been manually strangled.  Semen was found in her vagina.  In 2005, DNA tests were performed on that semen, and that DNA profile matched appellant's.[16]

The general rule is that the defendant is to be tried only for the offense charged, not for any other crimes or for being a criminal generally.[17]  However, evidence of extraneous acts of misconduct may be admissible if (1) the uncharged act is relevant to a material issue in the case, and (2) the probative value of that evidence is not significantly outweighed by

---

[14] The judge explained that she had "considered factors, including both involved female victims; both involved victims who were found naked in a sexual position; both cases involved no eyewitnesses; both cases occurred in the north to northwest Fort Worth area; and both involved evidence of sexual assault, as well as manual strangulation."

[15] The defense argued that there were insufficient similarities between the two offenses: Ms. Navarro was an adult, Vanessa Villa was a child; Vanessa was killed in her home, Ms. Navarro was killed in a park; appellant knew Vanessa, there was no evidence that he knew Ms. Navarro; Ms. Navarro had been hit on the head as well as strangled, Vanessa had only been strangled; Vanessa was murdered in 1986, Ms. Navarro was killed nine years later.

[16] There was also an unknown, third person's DNA profile discovered as a "minor contributor" to sperm found in the victim's vagina.

[17] *Crank v. State*, 761 S.W.2d 328, 341 (Tex. Crim. App. 1988).

its prejudicial effect.[18]   Because the propensity to commit crimes is not a material fact in a criminal case, Rule 404(b) explicitly prohibits the admission of uncharged acts to prove conduct in conformity with a bad character.[19]

One of the main rationales for admitting extraneous-offense evidence is to prove the identity of the offender.[20]   Here, the theory of relevancy is usually that of *modus operandi* in which the pattern and characteristics of the charged crime and the uncharged misconduct are so distinctively similar that they constitute a "signature."[21]   Usually, it is the accretion of small, sometimes individually insignificant, details that marks each crime as the handiwork or *modus operandi* of a single individual.  No rigid rules dictate what constitutes sufficient similarities; rather, the common characteristics may be proximity in time and place, mode of commission of the crimes, the person's dress, or any other elements which mark both crimes

---

[18] *Id.* at 342; *see also Williams v. State*, 662 S.W.2d 344, 346 (Tex. Crim. App. 1983).

[19] T EX. R. EVID. 404(b) ("Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. . . ."); *see Rankin v. State*, 974 S.W.2d 707, 709 (Tex. Crim. App. 1996) ("if evidence (1) is introduced for a purpose other than character conformity, (2) has relevance to a 'fact of consequence' in the case and (3) remains free of any other constitutional or statutory prohibitions, it is admissible").  The key, according to *Rankin*, is that the proponent explain precisely how the proffered evidence is probative of a fact of consequence.  *Id.*  The prosecutor did that in this case.

[20] *See Castillo v. State*, 739 S.W.2d 280, 289 (Tex. Crim. App. 1987).

[21] *Beets v. State*, 767 S.W.2d 711, 740-41 (Tex. Crim. App. 1988) (op. on reh'g) (defendant's "signature" use of the same unique weapon, the same financial motive, the same late time of day, and the same yard to dispose of bodies in two different murders sufficed to show identity).

as having been committed by the same person.[22]  But if the similarities are "generic," *i.e.*, typical to this type of crime, they will not constitute a "signature" crime.[23]  Sometimes, however, the "signature" is one unique characteristic.  For example, suppose that three bank robberies are committed over a four-year period in different cities in which the robber used an antique silver crossbow.  This scenario is so unusual that it is highly likely that each robbery was committed by the same person using the same antique silver crossbow.  This is "the mark of Zorro" mode of proving identity; it is a remarkably unusual fact, in which a single detail suffices to establish identity.[24]

_____

[22] *See Taylor v. State*, 920 S.W.2d 319, 322 (Tex. Crim. App. 1996) (a robbery-murder committed a few blocks away and ten days before the charged capital murder in which the victim was also elderly, and had been strangled with a wire coat hanger was sufficiently similar the charged capital murder).

[23] *See, e.g., Ford v. State,* 484 S.W.2d 727, 730 (Tex. Crim. App. 1972) (extraneous offense was inadmissible because it occurred two months before the charged offense, involved three more assailants than the charged offense, and was carried out in a different manner); *Curtis v. State*, 89 S.W.3d 163, 172-74 (Tex. App.–Fort Worth 2002, pet. ref'd) (extraneous sexual assault was not sufficiently similar to sexual assault committed during capital murder to show identity; 82-year-old victim in extraneous offense was found nude, her vagina had been severely torn, there were no signs of strangulation, and she had not been killed, whereas 39-year-old murder victim was found partially clothed, had suffered no vaginal trauma, and her neck showed severe bruises from strangulation).

[24] *See, e.g., United States v. York,* 933 F.2d 1343, 1350 (7th Cir. 1991) (in prosecution for attempt to defraud an insurance company after defendant murdered his business partner, dumped her body inside the bar they owned together, and then destroyed the bar by setting off two explosions, the trial court did not err in admitting evidence that, three years earlier, the defendant collected life insurance proceeds after his wife was murdered, even though the defendant was never charged with her murder; noting that "Wigmore's 'doctrine of chances' tells us that highly unusual events are highly unlikely to repeat themselves . . . . [T]he odds of the same individual reaping [life insurance] benefits, within the space of three years, of two grisly murders of people he had reason to be hostile toward seem incredibly low, certainly low enough to support an inference that the windfalls were the product of design rather than the vagaries of chance. . . . This inference is purely objective, and has nothing to do with a subjective assessment of York's character."); *United States v. Woods*, 484 F.2d 127, 135 (4th Cir. 1973) (in trial for murdering her eight-month-old foster son by inducing

In this trial, the evidence concerning the rape-murder of Maria Navarro was highly probative of appellant's identity as the person who both raped and murdered Vanessa Villa under either the "Mark of Zorro" or the "*modus operandi*" rationale.  First, DNA found in both murder victims matched appellant's DNA profile–it is as if appellant left his calling card in both Vanessa and Maria or carved a "Z" upon their foreheads as his unique signature. Under Wigmore's "doctrine of chances," it is extraordinarily implausible to think that two murder victims would have had sexual intercourse with appellant shortly before their deaths, but that he was not the person who strangled them both.[25]  Second, the similarities between the two offenses marked them as products of appellant's *modus operandi*: both victims were manually strangled; both had been raped immediately before their deaths; their bodies were nude from the waist down; appellant's DNA was found in the vaginas of both victims.  The

---

cyanosis and other respiratory difficulties, trial court did not err in admitting evidence that nine infants in defendant's custody had suffered similar difficulties, and that seven of those infants died; applying "the doctrine of chances," the court held that the other deaths were admissible to prove the identity of the foster son's killer "because of the remoteness of the possibility that so many infants in the care and custody of defendant would suffer . . . respiratory difficulties if they were not induced by the defendant's wrongdoing").

[25] See *Plante v. State*, 692 S.W.2d 487 (Tex. Crim. App. 1985), in which this Court quoted Dean Wigmore:

> "Without formulating any accurate test, and without attempting by numerous instances to secure absolute certainty of inference, the mind applies this rough and instinctive process of reasoning, namely, that an unusual and abnormal element might perhaps be present in one instance, but that the oftener similar instances occur with similar results, the less likely is the abnormal element likely to be the true explanation of them."

*Id.* at 491-92 (quoting 2 JOHN WIGMORE, WIGMORE ON EVIDENCE § 302 (Chadbourn rev. ed. 1979)); *see Morgan v. State*, 692 S.W.2d 877, 881-82 (Tex. Crim. App. 1985) (under doctrine of chances, trial court did not abuse its discretion in admitting evidence that defendant touched complainant's and her sister's genitals on other occasions).

similarities of these details are sufficient to  mark the two rape-murders as the handiwork of a single person, appellant.[26]

Appellant argues that the rape-murder of Maria Navarro was too dissimilar and too remote in time from that of Vanessa to constitute appellant's "signature" or *modus operandi*.[27]  Some dissimilarities existed between the two victims and the circumstances of the murders, but those dissimilarities do not affect the specific issue for which the extraneous offense was admitted:  Did appellant both rape and murder Vanessa, leaving his DNA calling card during that offense?  The probative value of the evidence concerning Maria Navarro's rape-murder is the fact that appellant's DNA was found in her vagina also.  All other dissimilarities between the offenses–years between the crimes, age of the victims, location, and so forth–are immaterial to the singular relevant fact: appellant's semen was deposited in their vaginas at or near the time of their strangulation deaths.

That singularity also ensures that the probative value of the evidence was not substantially outweighed by any unfair prejudice under Rule 403.  Appellant argues that the evidence concerning Maria Navarro's murder "had obviously great potential to impress the jury 'in some irrational but nevertheless indelible way.'"[28] He accurately notes that the State

---

[26] *See Ford v. State*, 484 S.W.2d 727, 730 (Tex. Crim. App. 1972) ("What must be shown to make the evidence of the extraneous crime admissible is something that sets it apart from its class or type of crime in general, and marks it distinctively in the same manner as the principal crime.").

[27] See note 14 *supra*.

[28] Appellant's Brief at 56.

spent a great deal of trial time proving the extraneous offense.  But developing the chain of custody of vaginal swabs, the analysis for semen, and the identification of the DNA profile that was then matched with appellant's, requires a long list of witnesses and a slow plod through the pertinent scientific procedures.  The State's emphasis throughout, however, was upon the unemotional science of DNA profiling and identification, not the gory details of the extraneous murder.  This was not evidence that might lead the jury into making an irrational or emotional decision; it was calculated to result in a rational decision based upon modern science, genetic fingerprinting, and probabilities.[29]

In sum, we cannot say that the trial judge abused her discretion in admitting the evidence of Maria Navarro's rape and murder to prove that appellant murdered Vanessa at the same time that he raped her.[30]  We overrule appellant's first point of error.

## B.     The Trial Court's Failure to Charge the Jury on Lesser-Included Offenses

In points of error two and three, appellant claims that the trial court erred in denying his requested jury charge on the lesser-included offenses of murder and of aggravated sexual assault.  He claims that he was entitled to a charge on aggravated sexual assault because the State's witness testified that it is possible for sperm to remain in the vaginal vault for up to

---

[29] *See Santellan v. State*, 939 S.W.2d 155, 169 (Tex. Crim. App. 1997) (setting out and discussing the balancing factors courts are to use in deciding whether extraneous-offense evidence should be admitted over a Rule 403 objection).

[30] *Montgomery v. State*, 810 S.W.2d 372, 391-93 (Tex. Crim. App. 1991) (op. on reh'g) (trial court's ruling on the admissibility of extraneous-offense evidence will not be reversed if the ruling is "within the zone of reasonable disagreement.").

72 hours after intercourse. "Thus, according to this undisputed expert testimony, and according to a rational interpretation of the physical evidence, the murder and the aggravated sexual assault could not be said to have occurred in the same event."[31] The State argues that there was no evidence that would allow a rational jury to find that appellant committed either rape *or* murder, but not both.

In determining if the jury should be charged on a lesser offense, this Court applies a two-step analysis.[32] First, we decide if the offense is a lesser-included offense of the charged offense by comparing the elements of the greater offense, as pled in the indictment, with the elements in the lesser offense.[33] Second, we decide if there is some evidence in the record from which a rational jury could acquit the defendant of the greater offense while convicting him of the lesser-included offense.[34] The evidence must establish the lesser-included offense as a valid rational alternative to the charged offense.[35]

---

[31] Appellant's Brief at 62-63.

[32] *Feldman v. State*, 71 S.W.3d 738, 750 (Tex. Crim. App. 2002).

[33] *Hall v. State*, 225 S.W.3d 524, 525 (Tex. Crim. App. 2007) (adopting and explaining the "cognate pleadings" approach to the determination of lesser-included offenses).

[34] *Feldman*, 71 S.W.3d at 750.

[35] *Id.* In *Arevalo v. State*, 943 S.W.2d 887 (Tex. Crim. App. 1997), we explained why the evidence raising a lesser-included offense must provide a viable and rational alternative to the greater offense:

> The second prong of the test preserves the integrity of the jury as the factfinder by ensuring that the jury is instructed as to a lesser included offense only when that offense constitutes a valid, rational alternative to the charged offense. If a jury were instructed on a lesser included offense even though the evidence did not raise it, then the instruction "would constitute an invitation to the jury to return a compromise or

In this case, the only evidence that appellant points to as raising an issue of the lesser-included offenses of murder or aggravated sexual assault is the medical examiner's testimony that it is possible for sperm to remain in a person's vaginal vault for up to 72 hours. But this evidence raises only a theoretical possibility that the rape and murder could be disconnected in time and space. There was no evidence in this record that Vanessa's rape and murder were, in fact, disconnected. Quite the reverse.

The medical examiner testified that, in this particular case, Vanessa's rape and murder occurred at the same time because the vaginal trauma was inflicted contemporaneously with her death. He stated that the tear on the back wall of her vagina had to be a perimortem injury, as her blood supply was cut off before that wound could swell. There is no evidence that could support a rational finding that some third person, either known or unknown, snuck into Vanessa's bedroom and strangled her immediately after appellant had raped her or that someone else raped her and then appellant immediately snuck in and strangled her (and, in the process, deposited his sperm on the bedspread and in her vagina). Neither of these hypothetical scenarios is a rational alternative to the commission of a rape-murder by a single individual who deposited semen laden with appellant's DNA at the scene.[36] We overrule

---

otherwise unwarranted verdict."
*Id*. at 889.

[36] *Feldman*, 71 S.W.3d at 754; *Threadgill v. State*, 146 S.W.3d 654, 665-66 (Tex. Crim. App. 2004) (in capital murder prosecution, defendant failed to show that trial court abused its discretion in refusing to give jury charges on lesser-included offenses of murder and felony-murder; evidence did not raise them as a rational alternative to the charged offense); *Hampton v. State*, 109 S.W.3d 437, 441 (Tex. Crim. App. 2003) (stating that "it is not enough that the jury may disbelieve crucial

appellant's second and third points of error.

## C.    Jury Selection Issues

In his fourth point of error, appellant claims that the trial judge improperly prevented him from fully questioning a prospective juror, Ms. Betty Martin, regarding her views on the death penalty before granting the State's challenge for cause.[37]  He notes that the State's questioning of Ms. Martin spanned nineteen pages, while his own spanned only twelve pages.  Although appellant was not permitted to ask Ms. Martin every question that he wished to pose, he was given the opportunity to examine her.  But Ms. Martin was firm in stating that she could not answer the special issues so as to allow a sentence of death.[38]

_____

evidence pertaining to the greater offense, but rather, there must be some evidence directly germane to the lesser-included offense for the finder of fact to consider before an instruction on a lesser-included offense is warranted.").

[37] Appellant objected at trial that the trial court did not permit him to specifically ask the prospective juror: (1) if she could honestly answer the mitigation issue; (2) if she would generally answer the questions untruthfully to get a particular punishment outcome; and (3) if she would consciously distort facts and evidence to answer the questions in a particular way.

[38] For example, the prosecutor asked Ms. Martin:
Q:    And do you believe that it's wrong to have a death penalty?
A:    No. I don't think it's wrong.  I just don't think I can give it to somebody.
Q:    Okay.  That's fine, so your view is that–and obviously there's some people that feel that way, that their makeup, the way that they're constituted is they cannot sentence another human being to death.  They just can't do it.
A:    Right.
Q:    Is that the category you fall in?
A:    Yes.
Later, the prosecutor explained the mitigation question, and then asked Ms. Martin:
Q:    . . . Other people say, I've got a profound belief about the death penalty.  I cannot participate in the process.  I could not answer those questions knowing that the death penalty was going to result, so I need to opt out.  I need to tell the judge that that's just not something I could do.  If this was a burglary or kidnapping, I'd be fine, but this is just not a system that I can be part of.

Appellant's counsel also questioned Ms. Martin on this topic;[39] he kept trying to change Ms. Martin's mind, but eventually the trial judge interrupted and ended the questioning by granting the State's challenge for cause.

Appellant argues that the trial court deprived him of "meaningful participation by refusing him the opportunity to determine for himself whether the prospective juror understood the court's instructions and the oath to answer the special issues." But Ms.

---

> So nobody would expect that if you served on the jury that you would lie about any of your answers, but someone who can't participate and can't serve, this is the time they need to tell us that. So what is your view?
>
> A: Based on those questions, it makes it look a little easier, but when it comes down to it, I just don't think I can do it.
> . . .
> Q: So when you got to that situation on the last question, you would just have to answer that one yes; is that right?
> A: Correct.
> Q: In every instance?
> A: Yes.
> Q: To avoid the death penalty?
> A: Probably, yes.

[39] When appellant's counsel questioned Ms. Martin, she continued to insist that she would always answer the mitigation question in a way to avoid the death penalty.

> Q: And when we say honest, Ms. Martin, as you look down on this fourth line, it asks you to see if there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than death be imposed. And that's again where you have to be honest. I take it you would do that in answering that question?
> A: When I'm sitting here looking at it, I don't think I could. No.
> . . .
> Q: And the main thing is you would be honest yourself on the third question. And by the way, it gives the jurors a wide latitude. It's what they think it is as long as they answer it honestly. You see what I'm saying?
> A: I see what you're saying, but it still says that the sentence of life imprisonment rather than the death sentence be imposed.
> Q: Yes, ma'am.
> A: I can't. I just couldn't do that to anybody.

Martin had made herself clear; she understood the law and the oath, but she was not going to answer those questions in a way so as to impose the death penalty. The trial judge has considerable discretion concerning how long a prospective juror may be questioned on a particular topic and how many times the juror must repeat herself.[40] At some point the trial judge must decide that further questioning will be fruitless.[41] After reading the record of Ms. Martin's questioning, we conclude that the trial judge did not abuse her discretion. Appellant's fourth point of error is overruled.

In his fifth and sixth points of error, appellant claims that the trial judge erred by granting the State's challenges for cause against two prospective jurors in violation of *Witherspoon v. Illinois*,[42] and *Wainwright v. Witt*.[43] Under *Witherspoon* and *Witt*, the trial judge may excuse prospective jurors based upon their views of the death penalty only if these views will prevent or substantially impair the jurors from following their oaths and the applicable law.[44] "When a prospective juror's answers are vacillating, unclear, or

---

[40] *See Barajas v. State*, 93 S.W.3d 36, 38 (Tex. Crim. App. 2002) (trial court has broad discretion over jury-selection process, otherwise "voir dire could go on forever"); *Allridge v. State*, 762 S.W.2d 146, 167 (Tex. Crim. App. 1988) (a trial court has broad discretion to impose reasonable limitations on voir dire examination).

[41] *See Dinkins v. State*, 894 S.W.2d 330, 345 (Tex. Crim. App. 1995) (a trial judge acts within his discretion in limiting voir dire when the questions are duplicitous or repetitious).

[42] 391 U.S. 510 (1968).

[43] 469 U.S. 412 (1985).

[44] *Witherspoon*, 391 U.S. at 522 (prospective jurors who can set aside their beliefs against capital punishment and honestly answer the special issues are not properly challengeable for cause); *Witt*, 469 U.S. at 424 (prospective jurors are challengeable for cause if their views about the death

contradictory, we accord deference to the trial court's decision," and will not second-guess him when the prospective jurors are "persistently uncertain about their ability to follow the law."[45] We grant the trial judge considerable deference, because she is in the best position to evaluate the prospective juror's demeanor and the tone and tenor of responses.[46]

Appellant argues that prospective juror Joseph Maldonado, although he was opposed to the death penalty, never said that his personal views would "substantially impair" his ability to follow the law in answering the special issues. He did not use that specific phrase, but he was clear that he could not follow the law in answering the special issues if it would lead to a death sentence.[47] At one point he told appellant's attorney that he would be able to

---

penalty would prevent or substantially impair the performance of their duties in accordance with their instructions and oath).

[45] *Russeau v. State*, 171 S.W.3d 871, 879 (Tex. Crim. App. 2005).

[46] *Colburn v. State*, 966 S.W.2d 511, 517 (Tex. Crim. App. 1998).

[47] The prosecutor asked him, in various ways, what effect his views would have upon his ability to answer the special issues:

Q: . . . on question 39 we asked are your views about the death penalty so strong that they would prevent or interfere with your ability to perform your duties as a fair, objective and impartial juror where the death penalty is a possible sentence, you circled yes.

A: Well, yeah, I was–that–that was a true answer. I–I–

Q: Okay.

A: It would probably affect my views, yes.
    . . .

A: Well, I–I can tell you today probably that I would–that–that I am against the death penalty.

Q: Okay. Now–you know, and bear in mind there are people who are opposed to the death penalty, but they can serve because they can apply–they can say, well I'll answer the questions and I'll do what I have to do even though I'm against the death penalty. But there are some people that–that really have a deep moral belief about it and they can't, so–

A: That's me.

Q: That's you?

A: Yes.

follow his oath and be truthful.  This was after Mr. Maldonado told appellant's counsel that he did not give a truthful answer to question 41 on the juror questionnaire form asking if he could vote to impose the death penalty if the law established that the death penalty was appropriate.  Mr. Maldonado had circled "yes," he could vote to impose the death penalty, but during the questioning he realized that he could not do so. When the judge tried to clarify the venireman's position, Mr. Maldonado said that he should have put "I don't know" to that question because he believed that he might be able to impose the death penalty if it involved "a small child or something like that."  The trial judge then asked, "So except for that, you–you would have answered differently, that you're opposed to it, is that not what I understand?"  Mr. Maldonado said, "Uh-huh, uh-huh."  The trial judge did not requestion Mr. Maldonado about whether his views about the death penalty were so strong that they would prevent or interfere with his ability to perform his duties as an impartial juror because he had already answered that question, number 39, affirmatively both on the written juror questionnaire and during the prosecutor's questioning.  At best, Mr. Maldonado was a

---

Q:    You absolutely can't?
A:    Yes, sir.
Q:    Are you pretty sure about that?
A:    Yes, sir.
        . . .
Q:    Okay.  And–like I say, I know that–that if you were called on to serve you'd do the very best you could, but the bottom line is you could never answer these questions yes, yes and no, knowing there's going to be a death penalty, is that right?
A:    Yes, sir.
Q:    Absolutely?
A:    Absolutely.

vacillating juror who gave contradictory answers to numbers 39 and 41 on the jury questionnaire. We therefore defer to the trial judge, who can best determine, based upon the prospective juror's tone and tenor, whether that person could follow the applicable law despite his views about the death penalty.[48] We overrule appellant's fifth point of error.

In his sixth point of error, appellant claims that the trial court erred in excusing Ms. Carla Rodenkirk despite her strong feelings against the death penalty. She repeatedly said that she did not think that she could sentence someone to death and that her views would affect her ability to serve in this case.[49] She later told appellant's attorney that she could follow her oath and would not violate it just to reach a particular result, but she then exclaimed, "I couldn't live with myself afterwards. Do you want me to be able to live with

---

[48] *See Feldman v. State*, 71 S.W.3d 738, 749 (Tex. Crim. App. 2002).

[49] The prosecutor questioned Ms. Rodenkirk:

Q: Is there–can you tell me how you feel about the death penalty, though?
A: I just think that–I don't think I could sentence someone to death. That is just too strong a statement, I think. I–I personally I couldn't do that.
Q: Okay.
A: That's–I mean, I just–I feel like–it is, it's just–not being fair, but I can't think of a better term to think of–to describe it to you right now, but I just don't think it's the right thing to do.
   . . .
Q: All right. And I think with regard to the question specifically you were asked, and you answered, I'm opposed to the death penalty, and you would have a difficult time voting it to impose it regardless of the facts and the law in the case and that you're–is that true?
A: Yes, yes, yes, yes.
Q: And you also answered that your views about the death penalty were so strong that they would prevent or interfere with your ability to perform your duties as a fair, objective and impartial juror in a case where the death penalty is a possible sentence.
       So you said your views were so strong that they would affect your ability to serve in this case?
A: Yes.

myself afterwards?"  She told the judge that she wanted "to be perfectly clear that it is a violation of my conscience."  And the trial judge noted on the record that Ms. Rodenkirk was "visibly upset" by this dilemma.

We conclude that Ms. Rodenkirk was a vacillating juror like the veniremember in *Granados v. State*[50] who first told the trial court that she probably could not answer the special issues because of her opposition to the death penalty.[51]  The veniremember in *Granados* then said that she could follow the law, but it would "upset" her: "I would have to do it, but it would just eat me up inside, and I don't want that on my conscience.  But yet if I was called, I would have to do it."[52]  In *Granados*, we concluded that the trial court had a rational basis for concluding that the veniremember's personal feelings would substantially impair her ability to be fair and to follow the court's instructions and her oath.[53]  The same is true in this case.  The trial judge did not abuse her discretion in granting the State's challenge for cause based upon Ms. Rodenkirk's inability to answer the special issues in a way that would result in the death penalty without violating her conscience and by making it impossible for her to live with herself afterwards.  Appellant's sixth point of error is overruled.

---

[50] 85 S.W.3d 217 (Tex. Crim. App. 2002).

[51] *Id.* at 232.

[52] *Id.*

[53] *Id.* at 232-33.

**C.    Evidentiary Issues**

In his seventh point of error, appellant claims that the trial court violated his Sixth Amendment right to confrontation by admitting, over his objection, testimonial statements in Exhibits 171, 172, and 173, which, he asserts, are parole revocation documents.[54] We conclude that appellant has forfeited this issue on appeal because there are no parole revocation certificates in Exhibits 171, 172, or 173. Those exhibits deal with certificates of parole releasing appellant from prison, not revoking his parole. If there once had been some revocation certificates attached to those documents, they are not in the record that this Court has. By failing to ensure that the appellate record contains the material that is relevant to his point of error, appellant has forfeited this issue.[55]

In his eighth point of error, appellant claims that the trial court erred in refusing to orally instruct the jury, at the time that the evidence was introduced during the punishment

---

[54] According to appellant, the State offered three Board of Pardons and Paroles certificates showing that his parole was revoked in a prior burglary case. These certificates purportedly include language that, after appellant had been paroled on administrative release, he "subsequently failed to fulfill the terms and conditions of said release, and is therefore not worthy of the trust and confidence placed therein. . ." and that he had "violated the conditions of administrative release" and was an "administrative release violator." Appellant argued that he should be entitled to cross-examine a witness "as to the reason for revocation." In his Brief, appellant states that the record shows that appellant's counsel was arguing about language contained on the third page of the parole documents, but, in the appellate record, Exhibits 171-173 contain only one page each.

[55] *See Rowell v. State*, 66 S.W.3d 279, 282 (Tex. Crim. App. 2001) (under TEX. R. APP. P. 34.6, "It is no longer necessary, or sufficient, for a party to argue that the appeal should be decided by hypotheses about missing portions of the record"; each party must "determine what is necessary for a record to be so complete as to enable the appellate court to decide the point of error (including its preservation and its effect)").

phase, that extraneous acts of misconduct must be proven beyond a reasonable doubt.[56]  We have previously rejected this contention in *Jackson v. State*,[57] and appellant fails to persuade us to overrule that holding.[58]  Appellant's eighth point of error is overruled.

In his ninth and tenth points of error, appellant claims that the warrantless seizure of his blood sample, taken pursuant to Texas statute while he was in prison, violated both the Fourth Amendment and Article I, section 9, of the Texas Constitution.[59]  We disagree.  This blood sample was taken pursuant to a mandatory DNA statute.  No warrant was necessary.

Chapter 411, Subchapter G of the Texas Government Code deals with this state's DNA database system.  The legislature's stated primary purpose of that database system is to assist law-enforcement agencies "in the investigation or prosecution of sex-related offenses or other offenses in which biological evidence is recovered."[60]  The legislature has

---

[56] The trial judge did include appellant's requested instruction in the written jury charge.

[57] 992 S.W.2d 469 (Tex. Crim. App. 1999).

[58] *Jackson*, 992 S.W.2d at 477 (trial court was not required to give an instruction on the burden of proof at the time evidence of unadjudicated offenses and bad acts was admitted during penalty phase of capital murder trial); *see also Hunter v. State*, 243 S.W.3d 664, 674 (Tex. Crim. App. 2007) (no error in declining to give a burden-of-proof instruction concerning extraneous offenses in capital punishment phase as long as the punishment charge properly requires the State to prove the special issues, other than mitigation, beyond a reasonable doubt), *cert. denied*, 2008 U.S. LEXIS 6609 (2008).

[59] Because appellant argues these two claims as if the federal and constitutional provisions were identical in scope and content, we will do the same. *See Muniz v. State*, 851 S.W.2d 238, 251-52 (Tex. Crim. App. 1993) (declining to address Texas constitutional claim when defendant offered no argument or authority concerning how protection under state constitution differed from that under federal constitution).

[60] TEX. GOV'T CODE § 411.143(a).  All references to the Government Code statutes cited in appellant's ninth through twelfth points of error refer to the version in existence at the time of the

mandated that certain categories of persons are required to submit blood samples for inclusion in the DNA database system. These categories include persons charged with or convicted of certain felonies,[61] persons placed on community supervision for certain offenses,[62] and certain inmates,[63] especially those charged with, or convicted of, sex-related offenses. This statutory requirement is much akin to those mandating fingerprinting,[64] and the DNA statute, like that for fingerprinting, does not require individualized suspicion or probable cause as a predicate for taking a blood sample. To ensure a person's privacy, however, the legislature has also mandated that the records stored in the DNA database remain confidential, and that the information in that database may be used only as authorized by Chapter 411.[65]

Because of the importance of DNA as an identification method, all 50 states and the federal government have adopted DNA collection and databank storage statutes that,

---

blood draw in 2000.

[61] *Id.*, § 411.1471. If the person is acquitted of that felony or the prosecution is dismissed, the DNA specimen and record must be immediately destroyed. *Id.*, § 411.1471(e).

[62] *Id.*, § 411.1472(a).

[63] *Id.*, § 411.148(a).

[64] *See, e.g.,* TEX. CODE CRIM. PROC. art. 38.33, § 1 ("The court shall order that a defendant who is convicted of a felony or a misdemeanor offense that is punishable by confinement in jail have a thumbprint of the defendant's right thumb rolled legibly on the judgment or the docket sheet in the case."); TEX. CODE CRIM. PROC. art. 42.09, § 8(d) (TDCJ institutional division shall supply parole officer with parolee's fingerprints and photograph, as well as a summary of his criminal records). Fingerprint records, like DNA records, are statutorily required to be kept in a statewide computer database. TEX. CODE CRIM. PROC. art. 60.12(a).

[65] *Id.*, § 411.153.

although not identical, are similar to the ones in Texas.[66] Generally these statutes require the extraction and indexing of DNA taken from individuals convicted of certain felonies.[67]

Although the taking of a blood sample for DNA analysis purposes is clearly a search, the Fourth Amendment does not proscribe all searches, only those that are unreasonable.[68] The United States Supreme Court has yet to address the validity of state and federal DNA collection statutes under the Fourth Amendment, but state and federal courts that have addressed the issue of a warrantless search for DNA databank samples pursuant to statute are

---

[66] *See* Michelle Hibbert, *DNA Databanks: Law Enforcement's Greatest Surveillance Tool?*, 34 WAKE FOREST L. REV. 767, 771 n.12 (1999); Robyn C. Miller, Annotation, *Validity, Construction, and Operation of State DNA Database Statutes*, 76 A.L.R. 5th 239 at § 2[b] (2000).

[67] *Id.*

[68] *See Pennsylvania v. Mimms*, 434 U.S. 106, 108-09 (1977) ("The touchstone of our analysis under the Fourth Amendment is always the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security."). As a general proposition, the reasonableness of a search depends upon law-enforcement officers obtaining a warrant, but "the general rule of the Warrant Clause is not unyielding." *United States v. Kincade*, 379 F.3d 813, 822 (9th Cir. 2004) (en banc) (plurality op.). The Supreme Court has carved out numerous exceptions to the warrant requirement. *See, e.g., Chimel v. California*, 395 U.S. 752, 762-63 (1969) (holding that a warrantless search of a suspect's home incident to an arrest is reasonable if restricted to the area within the immediate control of the suspect); *Terry v. Ohio*, 392 U.S. 1, 27 (1968) (holding that a police officer may stop and frisk a person without probable cause if the officer has reasonable suspicion that the person may be armed and dangerous); *United States v. Knights*, 534 U.S. 112, 118 (2001) (applying totality of the circumstances–including authorization by a probation-search condition– to uphold search of probationer's apartment based on reasonable suspicion). The Supreme Court has also recognized the validity of suspicionless searches in specific areas such as airports, *see Chandler v. Miller*, 520 U.S. 305, 323 (1997), and prison cells, *Hudson v. Palmer*, 468 U.S. 517, 525-26 (1984); in "closely regulated" industries, *New York v. Burger*, 482 U.S. 691, 702 (1987); and when the government has a "special need" that is unrelated to general law enforcement, *New Jersey v. T.L.O.*, 469 U.S. 325, 353 (1985) (Blackmun, J., concurring).

almost unanimous in holding that these statutes do not violate the Fourth Amendment.[69]

The courts deciding this issue have split in their rationale. Some have stated that DNA collection statutes permit a warrantless, suspicionless search under the Supreme Court's "special needs" test.[70] Most federal and state courts, however, have upheld the DNA databank statutes under the "totality of circumstances" test.[71] This trend increased after the

---

[69] *See United States v. Amerson*, 483 F.3d 73, 78 n.3 (2d Cir.) ("All the federal circuits that have considered the question have upheld the state and federal DNA indexing laws, as have the overwhelming majority of district courts and state courts."), *cert. denied*, 128 S. Ct. 646 (2007).

[70] *See id*. at 78; *United States v. Hook*, 471 F.3d 766, 773 (7th Cir. 2006), *cert. denied*, 127 S. Ct. 2081 (2007). That test requires a court to determine if the asserted governmental interest serves a legitimate law enforcement "special need." *Amerson*, 483 F.3d at 80-83. If it does, then the court balances the special need against: "'(1) the nature of the privacy interest involved; (2) the character and degree of the governmental intrusion; and (3) the nature and immediacy of the government's needs, and the efficacy of its policy in addressing those needs.'" *Id*. at 81, 83-84.
    In *Amerson,* the court first decided that a DNA-indexing statute serves a law enforcement special need in helping to solve crimes. *Id.* at 81-83. Next, the court balanced that "special need" against the offender's privacy interests. The court concluded that probationers have diminished privacy expectations, the methods used for obtaining DNA samples are minimally invasive, and "the government has a compelling interest in rapidly and accurately solving crimes and that having DNA-based records of the identity of as many people as possible, and especially past offenders, effectuates this interest." *Id.* at 84-87. The court concluded that the government's interests greatly outweighed the probationers' reduced privacy expectations and therefore held that the DNA Act did not violate the Fourth Amendment. *Id.* at 89.

[71] *See Wilson v. Collins*, 517 F.3d 421, 427 (6th Cir. 2008); *United States v. Kriesel*, 508 F.3d 941, 946-47 (9th Cir. 2007); *United States v. Weikert*, 504 F.3d 1, 11 (1st Cir. 2007); *Banks v. United States*, 490 F.3d 1178, 1184-93 (10th Cir. 2007); *United States v. Kraklio*, 451 F.3d 922, 924 (8th Cir. 2006); *Johnson v. Quander*, 440 F.3d 489, 494 n.1, 496 (D.C. Cir. 2006); *United States v. Sczubelek*, 402 F.3d 175, 184 (3d Cir. 2005); *Padgett v. Donald*, 401 F.3d 1273, 1278 n.4 (11th Cir. 2005); *Groceman v. U.S. Dep't of Justice*, 354 F.3d 411, 413-14 (5th Cir. 2004) (per curiam); *Jones v. Murray*, 962 F.2d 302, 307 & n.2 (4th Cir. 1992); *Polston v. State*, 201 S.W.3d 406, 410-11 (Ark. 2005); *Gaines v. State*, 998 P.2d 166, 172 (Nev. 2000); *State v. Scarborough*, 201 S.W.3d 607, 618 (Tenn. 2006); *Doles v. State*, 994 P.2d 315, 319 (Wyo. 1999).

Supreme Court's decision in *Samson v. California*,[72] which used the "totality of the circumstances" test to uphold suspicionless searches of felons on parole, as long as the searches are not arbitrary, capricious, or harassing.[73] Even before *Samson*, numerous courts had applied the "totality of the circumstances" test and concluded that the governmental interest served by collecting DNA outweighed the minimal intrusion upon a probationer's or parolee's privacy.[74] We agree with those jurisdictions that have held that warrantless DNA collection and databank systems pass Fourth Amendment scrutiny under the "totality of the circumstances."

Appellant acknowledges these cases, but urges us to adopt the position expressed by the dissent in *United States v. Kincade*,[75] because "[u]nlike fingerprints that yield only identification, DNA contains information on other family members, on propensity for certain diseases, on recessive traits, and perhaps on propensity for certain behaviors as well as other health information."[76] Appellant is correct that information collected from a DNA analysis

---

[72] 547 U.S. 843 (2006).

[73] *Id.* at 856.

[74] *See, e.g., United States v. Kincade*, 379 F.3d 813, 839 (9th Cir. 2004) (en banc) (plurality op.). The Ninth Circuit noted "the well-established principle that parolees and other conditional releasees are not entitled to the full panoply of rights and protections possessed by the general public." *Id*. at 833; *see also State v. Anderson*, 733 N.W.2d 128, 139 (Minn. 2007) (a probationer's "reasonable expectation of privacy was diminished merely by virtue of his status as a probationer").

[75] 379 F.3d at 867 (Reinhardt, J., dissenting). Judge Reinhardt expressed the understandable concern at the power of DNA profiling because profiles could be "searched time and time again throughout the course of an individual's life." *Id.*

[76] Appellant's Brief at 98.

and profile could be used for many different purposes, not all of them salubrious. To guard against potential mischief, the Texas Legislature requires CODIS[77] information to be kept confidential.[78] Any unauthorized release of information is a crime.[79] In fact, the CODIS databank does not even contain any names, only an identification number which, if a DNA match is found, is sent to the originating entity that has the donor's name and other identifying information on file.[80] Regarding his argument concerning the potential for abuse, appellant has made no showing that any such abuse has occurred in the Texas CODIS system, much less that such abuse occurred in his case.[81] Further, appellant does not explain how obtaining a search warrant before taking a blood sample would prevent or mitigate such abuse. We overrule appellant's ninth and tenth points of error.

In his eleventh point of error, appellant claims that the DNA statute was unconstitutionally applied to him because the DNA profile obtained from a blood sample taken while he was in prison was retained in the CODIS databank even after his parole

---

[77] CODIS is the national DNA identification index system with which the Texas database must be compatible. TEX. GOV'T CODE § 411.142(f).

[78] TEX. GOV'T CODE § 411.153.

[79] *Id.*

[80] TEX. GOV'T CODE § 411.143(e).

[81] *See Amerson,* 483 F.3d at 87 ("[W]e underscore that were we faced with evidence of misuse of the DNA samples or scientific advances concerning the information that can be mined from the DNA footprint stored on the CODIS database, our analysis and ultimate conclusions might very well be different.") (citation omitted).

expired in July 2000. He quotes from *United States v. Weikert*,[82] which had, as an aside,

noted that it was not faced with an issue concerning the retention of DNA profiles in CODIS

after a person's parole or probation had expired.[83] Although several courts and law review

articles have expressed concern about the potential for abuse of this information, appellant

has not directed us to a single state or federal case that has held that the DNA record must

be expunged once an offender is released from supervision. In *Johnson v. Quander*,[84] the

D.C. Circuit explicitly held that no Fourth Amendment violation results from retaining a

DNA profile in the database after the offender is released from all supervision.[85] The court

explained that "accessing the records stored in the CODIS database is not a 'search' for

Fourth Amendment purposes," because "the process of matching one piece of personal

---

[82] 504 F.3d 1 (1st Cir. 2007).

[83] *Id.* at 15-17. The First Circuit noted:
The distinction in status between a current and a former offender clearly translates to a change in the privacy interests at stake. A former conditional releasee's increased expectation of privacy warrants a separate balancing of that privacy interest against the government's interest in retaining his profile in CODIS.

There are other considerations as well that support this separate balancing. The ongoing evolution in our understanding of DNA warrants particular caution in determining what is constitutionally permissible. DNA profiles possess unique properties that distinguish them from other records. . . . As we have explained, the technology surrounding DNA analysis is changing rapidly, and we think it more prudent to decide whether the DNA profile may be retained in CODIS following a term of conditional release in light of the state of technology when that issue is brought before us.
*Id.* at 16.

[84] 440 F.3d 489 (D.C. Cir. 2006).

[85] *Id.* at 498.

information against government records does not implicate the Fourth Amendment."[86]  It then analyzed CODIS to police files containing snapshots and fingerprint databases, concluding that if such material "is taken in conformance with the Fourth Amendment, the government's storage and use of it does not give rise to an independent Fourth Amendment claim." [87]  We agree with those courts that have held that the CODIS statutes are not unconstitutional because they allow for the retention of a DNA profile after a parolee's period of supervision is complete.  We overrule appellant's eleventh point of error.

In his twelfth point of error, appellant claims that (1) the State did not produce any evidence that Deborah Taylor, the person who drew appellant's blood sample at the Clements prison unit in 2000, met the statutory qualification to take that sample, and (2) when he told Ms. Taylor that he did not want to give her a blood sample, she told him, "If you don't do this, then you'll get a case for refusal, and you'll be here longer."

As to his first argument, we note that appellant testified that the person who took his blood sample was a woman who worked in the Clements infirmary and that she "[l]ooked like, I guess, a nurse." She signed the CODIS blood sample card as "Deborah Taylor" and

---

[86] *Id.*

[87] *Id*. at 499.  Similarly, in *Amerson*, the Second Circuit indicated that retention of the DNA profile in CODIS does not "change[ ] the ultimate analysis" because "we have upheld, in the past, the retention and use of information properly collected under the Fourth Amendment, if there was a strong enough public interest in retaining it, when there no longer was a diminished expectation of privacy."  483 F.3d at 86.  *See also Wilson v. Collins*, 517 F.3d 421, 428-30 (6th Cir. 2008) (rejecting contention that indefinite retention of DNA profile in CODIS system violated a person's legitimate privacy interests).

identified her "agency name" as TTUHSC, presumably the Texas Tech University Health

Science Center.[88]   Under Section 411.146, a CODIS blood sample must be collected in a

medically approved way by "(1) a physician, registered nurse, licensed vocational nurse,

licensed clinical laboratory technician; or (2) another person who is trained  to properly

collect blood samples or other specimens and supervised by a licensed physician."[89] As the

trial judge noted in her written findings, Section 411.148(h) permits TDCJ to "contract with

an individual or entity for the provision of phlebotomy services under this section."[90]

Because Ms. Taylor worked in the Clements Unit infirmary, "looked like a nurse" to

appellant, and stated that her agency was TTUHSC, we agree with the trial court's implicit

factual finding that Ms. Taylor was statutorily qualified to draw appellant's CODIS blood

---

[88] The trial judge entered written findings of fact and conclusions of law concerning appellant's motion to suppress his DNA profile.  Those findings included the following:

4.     On February 28, 2000, Deborah Taylor requested a blood sample from the Defendant. According to the Defendant's testimony, he did not want to give the sample, but the person who took the blood told him that if he did not cooperate, he would be subjected to disciplinary action that would lengthen his term of incarceration.  The Defendant then complied with the process.  (Neither Deborah Taylor nor anyone present for the blood draw, other than the Defendant, testified at the hearing).

5.     Pre-Trial Exhibit #4 was admitted at the hearing.  The left-hand side of that document was completed by Ms. Taylor at the time the sample was obtained from the Defendant.  The document states that her "agency name" is TTUHSC, which the Court assumes to be the Texas Tech University Health Science Center.  The statute specifically allows the institutional division to contract with an institution of higher education for services to collect samples.

6.     During the pre-trial hearing, the Defendant admitted that the blood sample was taken at the infirmary in the Clements Unit.

[89] TEX. GOV'T CODE § 411.146(a)(1) & (2) (Vernon 1999).

[90] TEX. GOV'T CODE § 411.148(h) (Vernon 1999).

sample.  Appellant offered no evidence that demonstrates her lack of qualifications.

As to his second argument, appellant relies upon  the former version of § 411.148 of the Government Code which stated, "An inmate may not be held past a statutory release date if the inmate fails or refuses to provide a blood sample or other specimen under this section. A penal institution may take other lawful administrative action against the inmate."[91]  First, the trial court was not required to believe appellant's self-serving hearsay statement about what Ms. Taylor purportedly told him. Second, as the State argues, the trial court may have interpreted Ms. Taylor's purported statement as one acknowledging possible "administrative action"–such as the loss of good time credits–should he refuse to comply with the mandatory statute.[92]  Appellant has failed to show that the trial judge abused her discretion in refusing to suppress the DNA profile obtained as a result of the analysis of his blood sample taken by Ms. Taylor.  Appellant's twelfth point of error is overruled.

In his thirteenth point of error, appellant contends that the trial judge deprived him of his Sixth (and Fourteenth) Amendment rights to present a defense by excluding "alternative perpetrator" evidence.  During his cross-examination of Detective Reyes, appellant wanted to question Det. Reyes about the fact that Rosa Clark, Vanessa's mother, gave him the name of Dolores Balderas as a possible suspect.  She suspected him because he had been

---

[91] TEX. GOV'T CODE § 411.148(d) (Vernon 1999).

[92] The trial court's factual findings state, "According to the Defendant's testimony, he did not want to give the sample, but the person who took the blood told him that if he did not cooperate, he would be subjected to disciplinary action which would lengthen his term of incarceration."

previously arrested for sexually assaulting his sister. She also gave Det. Reyes the name of Martin Martinez, a "doper" who occasionally lived in her home. The trial court declined to allow Det. Reyes to testify to these hearsay and double hearsay statements by Vanessa's mother. However, Det. Reyes did testify that Martinez voluntarily gave a DNA sample and that he was eliminated as a suspect. Det. Reyes also testified that Dolores Balderas, Bartolo Salazar, Van Johnson, and James McKelroy were other possible suspects who were investigated and/or interviewed. Those investigations did not lead anywhere. Thus, the only items of evidence that the trial court disallowed were the hearsay statements by Rosa Clark about her suspicions. Appellant has failed to show that Ms. Clark's suspicions were relevant or that her hearsay statements were reliable. He was not prevented from questioning Det. Reyes about the existence, development and investigation of other possible suspects in Vanessa's murder. He could present his defense without resort to unreliable hearsay.[93] The trial judge did not abuse her discretion in excluding that evidence.[94] Appellant's thirteenth point of error is overruled.

## D.    Constitutionality of Article 37.071

In his fourteenth point of error, appellant claims that the Texas death-penalty statute

---

[93] *See Potier v. State*, 68 S.W.3d 657, 662, 665 (Tex. Crim. App. 2002) (noting that "courts are free to apply evidentiary rules that are not arbitrary and unjustified," and concluding that "the exclusion of a defendant's evidence will be constitutional error only if the evidence forms such a vital portion of the case that exclusion effectively precludes the defendant from presenting a defense.").

[94] *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex. Crim. App. 1991) (op. on reh'g).

is unconstitutional because it fails to require the State to prove, beyond a reasonable doubt, that there are no mitigating circumstances that would warrant a life sentence. Appellant relies upon *Ring v. Arizona*,[95] and *Apprendi v. New Jersey*.[96] We have previously rejected this argument,[97] and appellant gives us no reason to revisit the issue. We overrule his fourteenth point of error.

**E.     Jury Charge Issues**

In four points of error, appellant claims that the trial court committed error in her punishment jury charge.

In point of error fifteen, appellant claims that she erred by overruling his objections to the charge on the ground that the indictment did not contain grand jury findings of probable cause on the three special issues. According to appellant, these special issues should have been contained in the indictment. We rejected this contention in *Russeau v. State*,[98] and appellant has not persuaded us to overrule that decision.

In point of error sixteen, appellant claims that the trial judge erred in charging the jury that it had to find whether there was a probability beyond a reasonable doubt that appellant would commit criminal acts of violence that would constitute a threat to society. Appellant

---

[95] 536 U.S. 584 (2002).

[96] 530 U.S. 466 (2000).

[97] *See Crutsinger v. State*, 206 S.W.3d 607, 613 (Tex. Crim. App. 2006); *Perry v. State*, 158 S.W.3d 438, 446-48 (Tex. Crim. App. 2004); *Hankins v. State*, 132 S.W.3d 380, 387 (Tex. Crim. App. 2004); *Resendiz v. State*, 112 S.W.3d 541, 550 (Tex. Crim. App. 2003).

[98] 171 S.W.3d 871, 886 (Tex. Crim. App. 2005).

argues that this instruction dilutes the reasonable-doubt standard. We rejected this contention

in *Rayford v. State*,[99] and appellant fails to persuade us that *Rayford* was wrongly decided.

In points of error seventeen and eighteen, appellant claims that the trial judge erred

in failing to instruct the jurors that they need not agree on what particular evidence is

mitigating. He argues that this failure violated his rights under the Fifth, Eighth, and

Fourteenth Amendments.[100] Because appellant was tried for an offense that he committed

in 1986, the applicable sentencing procedure is set out in Article 37.0711.[101] That article does

not require the jury to be instructed that they need not agree on what particular evidence

supports an affirmative finding on the mitigation special issue. Article 37.071, the provision

setting out the applicable sentencing procedure for capital cases committed after 1991, does

---

[99] 125 S.W.3d 521, 534 (Tex. Crim. App. 2003).

[100] Appellant complains that the jury instructions as set out in Article 37.0711 violated his right to equal protection under the Fourteenth Amendment because they are not precisely the same as those set out in Article 37.071 and do not include the explicit "non-unanimity" instruction that article 37.071 contains. Appellant argues that those who committed capital murders after the 1993 amendments to article 37.071 received additional protections via an explicit "non-unanimity" instruction that he did not and the enactment of those extra protections therefore violated his right to equal protection of the law. But appellant's constitutional rights are not violated simply because someone else, at a later point in time, receives even greater procedural protections than he did. *See State v. Howren*, 323 S.E.2d 335, 338 (N.C. 1984) ("If defendant's argument were accepted, the State would never be able to create new safeguards against error in criminal prosecutions without invalidating prosecutions conducted under prior less protective laws. . . . [T]he equal protection clause do[es] not require such an absurd result.").

[101] TEX. CODE CRIM. PROC. art. 37.0711, §1 ("This article applies to the sentencing procedure in a capital case for an offense that is committed before September 1, 1991 . . . .").

contain such an explicit instruction.[102]   Appellant relies primarily on *Mills v. Maryland*,[103]

which had held that Maryland's death-penalty scheme was unconstitutional because the jury

charge appeared to instruct the jurors that they could not consider any mitigating evidence

unless all twelve of them agreed on the existence of a particular mitigating circumstance.[104]

The question in this case, then, is as follows: Could the jurors in appellant's case have

reasonably believed that they could not consider any mitigating evidence in deciding the third

special issue unless all twelve of them found that a particular piece of evidence was

mitigating?  We think not.  A capital defendant cannot establish a constitutional violation

simply by claiming that an allegedly erroneous jury instruction could have or might have

affected some hypothetical jury.[105]

In this case, the jurors were explicitly instructed that they "shall consider mitigating

evidence that *a juror* might regard as reducing the defendant's moral blameworthiness."[106]

Here, the emphasis is upon "a" juror, not all twelve jurors.  The legislature chose its words

so that the jurors must consider any piece of evidence that any one or more of them might

consider as reducing a defendant's moral blameworthiness.  That does not mean that all of

---

[102]   EX. CODE CRIM. PROC. art. 37.071, §2(f)(3) (jury "need not agree on what particular evidence supports an affirmative finding on the [mitigation] issue").

[103] 486 U.S. 367 (1988).

[104] *Id.* at 384.

[105] *Penry v. State*, 178 S.W.3d 782, 785-86 (Tex. Crim. App. 2005).

[106] *See* TEX. CODE CRIM. PROC. art. 37.0711, § 3(f)(3) (emphasis added).

the jurors must conclude that a specific item of evidence is mitigating just because one juror thinks it is, but they must at least consider evidence that any one juror thinks is mitigating. We do not agree that the jury instructions as given were reasonably likely to be misunderstood by the jury or that they violated appellant's constitutional rights.[107] We overrule points of error fifteen, sixteen, seventeen, and eighteen.

## F.    The Lethal Injection Protocol

In his nineteenth point of error, appellant claims that the Texas-lethal injection protocol violates the federal constitution, the state constitution, and international law. Because appellant's execution is not imminent, his claim is not ripe for review.[108] Furthermore, appellant did not litigate this issue in the trial court, and the record is not

---

[107] *See Boyde v. California*, 494 U.S. 370, 380-81 (1990). In *Boyde*, the Supreme Court stated that the proper inquiry is whether

> there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence. Although a defendant need not establish that the jury was more likely than not to have been impermissibly inhibited by the instruction, a capital sentencing proceeding is not inconsistent with the Eighth Amendment if there is only a possibility of such an inhibition. This "reasonable likelihood" standard, we think, better accommodates the concerns of finality and accuracy than does a standard which makes the inquiry dependent on how a single hypothetical "reasonable" juror could or might have interpreted the instruction. . . . Jurors do not sit in solitary isolation booths parsing instructions for subtle shades of meaning in the same way that lawyers might. Differences among them in interpretation of instructions may be thrashed out in the deliberative process, with commonsense understanding of the instructions in the light of all that has taken place at the trial likely to prevail over technical hairsplitting.

*Id.*

[108] *Gallo v. State*, 239 S.W.3d 757, 780 (Tex. Crim. App. 2007).

sufficiently developed for this Court to resolve his claim.[109]  Appellant's nineteenth point of error is overruled.

Having found no reversible error, we affirm the judgment of the trial court.

Delivered: October 29, 2008

Publish

---

[109] *See Bible v. State*, 162 S.W.3d 234, 250 (Tex. Crim. App. 2005).