**Opinion filed August 28, 2009**



In The

# Eleventh Court of Appeals

<hr>

## No. 11-08-00071-CR

<hr>

**RAMON CISNEROS, Appellant**

**V.**

**STATE OF TEXAS, Appellee**

**On Appeal from the 118th District Court**

**Howard County, Texas**

**Trial Court Cause No. 9786**

### M E M O R A N D U M   O P I N I O N

The jury convicted Ramon Cisneros of murder and assessed his punishment at confinement for seventeen years and six months. We affirm.

*Issues on Appeal*

Appellant has briefed seven issues on appeal. First, appellant contends that the trial court abused its discretion by denying his motion to sever and granting the State's motion to consolidate his trial with the trial of a codefendant. In his second and third issues, appellant argues that the evidence is both legally and factually insufficient. In the next four issues, appellant contends that the trial court erred when it failed to instruct the jury on the issue of sudden passion arising from adequate cause, to instruct the jury when his codefendant entered a plea bargain agreement, and to

submit charges on the lesser included offenses of aggravated assault and criminally negligent homicide. We will address the challenges to the sufficiency of the evidence first.

*Sufficiency of the Evidence*

Appellant contends that the evidence is legally and factually insufficient to support his conviction. In order to determine if the evidence is legally sufficient, the appellate court reviews all of the evidence in the light most favorable to the verdict and determines whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Laster v. State*, 275 S.W.3d 512, 517-18 (Tex. Crim. App. 2009); *Jackson v. State*, 17 S.W.3d 664, 667 (Tex. Crim. App. 2000). To determine if the evidence is factually sufficient, the appellate court reviews all of the evidence in a neutral light. *Laster*, 275 S.W.3d at 519; *Watson v. State*, 204 S.W.3d 404, 414 (Tex. Crim. App. 2006); *Johnson v. State*, 23 S.W.3d 1, 10-11 (Tex. Crim. App. 2000); *Cain v. State*, 958 S.W.2d 404, 407-08 (Tex. Crim. App. 1997); *Clewis v. State*, 922 S.W.2d 126, 129 (Tex. Crim. App. 1996). Then, the reviewing court determines whether the evidence supporting the verdict is so weak that the verdict is clearly wrong and manifestly unjust or whether the verdict is against the great weight and preponderance of the conflicting evidence. *Watson*, 204 S.W.3d at 414-15; *Johnson*, 23 S.W.3d at 10-11.

Appellant and Dennis Boswell were indicted for the murder of the victim by causing him to fall from the side of a bridge. Appellant and Boswell were tried in a joint trial.

Big Spring Police Detective Jim Rider testified that he knew the victim as a transient who kept his things in three different "camps." Detective Rider usually saw him walking up and down Highway 87. Olga Perches testified that she called the victim "Australia" because he would tell her things about Australia when he came into the Rip Griffin Travel Center on Interstate 20 where she worked. Perches stated that the victim often talked about "off-the-wall things" but that he would not "harm" anyone.

On the night of his death, the victim came into the travel center between 10:00 and 11:00 p.m. Perches saw the victim leave the store and walk toward the bridge that crossed Interstate 20. There was a light blue car in the parking lot. Perches saw two girls get out of the car. She also saw a man walk quickly after the victim. Later, she heard an ambulance. The man and the two girls came into the building and used the restrooms. While Perches was asking a customer if

2

he knew what had happened, the man who had followed the victim walked passed her. Perches identified the man as appellant. Perches stated that she knew Boswell because she had worked with him. Perches stated that the man she saw follow the victim was not Boswell.

Big Spring Police Department Patrol Sergeant John Stowers testified that he responded to a call concerning a vehicle/pedestrian accident under the North Highway 87 bridge crossing Interstate 20. Sergeant Stowers received the call shortly before 11:00 p.m. He located the victim's body directly under the bridge, but could not find any evidence that a vehicle had actually struck the victim.

Wayne Jones, an identification technician for the Big Spring Police Department, testified that the victim had been removed when he arrived on the scene. Jones photographed the area, including the bloodstain on the highway. Jones found two sets of shoe prints on top of the bridge. The prints were against the rail of the bridge. One set of prints matched the victim's shoes; the other set of prints were not identified. The distance from the location of the shoe prints on the bridge to the highway below was twenty-eight feet.

Jones stated that he found the footprints next to the rail where a "half moon shape of dirt" had "accumulated from the weather and that type of thing." Jones estimated that the area was two feet by one and one-half feet. There was no dirt on the rest of the bridge. Jones testified that the footprints on the bridge were about a foot to the right of and above the bloodstain on the highway below. There was no evidence of drag marks.

At the emergency room, Jones photographed the victim and removed items from the body. Jones found a wallet and a pocketknife. The pocketknife was located "[d]eep down" in the pocket of the victim's jeans. The blade was bent and not very sharp. In the victim's other pocket was a shank that appeared to have been made from a broken letter opener. However, there were no grind marks on the shank except at "the very end where [it had] been broken off."

Jennifer Cisneros testified that, about two years prior to the victim's death, he had harassed her where she was working at that time. She and the victim had a "confrontation" one morning, and she was shoved up against the wall. When Jennifer told the victim that she was going to call the police, the victim told her "that he knew where [Jennifer and her daughter] laid [their] heads at night." He left, and she did not report the incident to the police.

3

Jennifer saw the victim again two years later on the night that he died. At that time, she was dating appellant; at the time of trial, she and appellant were married. Jennifer, appellant, Boswell, J.P. McBride, and LaFond Johnson were sitting in Boswell's baby blue car outside of the travel center; they were waiting on Boswell's girlfriend to get off work. Jennifer and appellant had been arguing and drinking. When the victim walked out, Jennifer told appellant that the victim had hurt her "one time."

Appellant became angry at the victim and told Boswell to let him out of the car. Jennifer stated that she thought appellant wanted to confront the victim. Eventually, Boswell allowed appellant to get out of the car. Boswell asked appellant if he "want[ed] to go back." Jennifer testified that Boswell meant did appellant want to go back to jail. Appellant said that nobody was going to hurt Jennifer and started to walk after the victim. Jennifer testified that Boswell said, " F--k it, then." Boswell grabbed the keys from the ignition, "followed" appellant, and "headed out" toward the bridge. Jennifer did not see what happened because she went inside to use the restroom. She did see that appellant had "met up with" the victim, and she remembered that appellant's hands were up.

Jennifer was inside the store waiting for Johnson to get off the phone when appellant returned. Appellant was very serious and told her to "[g]et in the car." Appellant did not tell her what had happened on the bridge.

Later, Boswell's girlfriend said that a dead man was found under the bridge. Jennifer was shocked and scared. Jennifer remembered appellant saying that he "didn't do it." Jennifer testified that she was terrified when she gave her statement to police and that that was why some of her testimony at trial varied from her prior statement.

Teresa Paige was traveling toward the bridge with her windows down and her sunroof open. She could hear people arguing. While she was stopped at a traffic light, she saw an older man who was "hunched over" walk right behind her car. A Hispanic male was yelling at the older man. Another man told the Hispanic man to stop. The situation made Paige nervous, and she rolled up her windows, shut the sunroof, and locked the doors. She drove off when the light turned green. She looked back in her rear view mirror and saw two men on the bridge. She thought that the Hispanic man was holding the older man by his shoulders, but she could not be sure.

4

Johnson testified that she went with Jennifer, Boswell, and appellant to wait for Boswell's girlfriend to get off work. Jennifer saw the victim and said that one time he had threatened to hit her. Appellant got mad and said that he was going to "beat [the victim's] ass." Johnson said that they tried to talk appellant out of it. Johnson testified that they had all seen the victim "plenty of times" and that she knew he was not "mentally all there." Boswell asked appellant, "Man, do you want to go back?" Johnson stated that she thought Boswell meant did appellant want to go back to prison. Appellant said, "I'll go back." Boswell and appellant "took off running." Before he left, appellant gave Johnson money to make a phone call. Johnson thought that Boswell and appellant were going to harass the victim, and she went inside the store to make a phone call.

Johnson stated that, the next time she saw appellant, she was still on the phone. Appellant told her to get off the phone and said something about throwing "the guy over the bridge." Johnson testified that she did not know if appellant was serious and that she "freaked out" and hung up the phone. They sat in the car for a few minutes. She saw the police cars and the emergency vehicle. They drove off. Later, they stopped, and appellant and Boswell got out of the car. Johnson could tell that the men were arguing. She was nervous and told them that she wanted to go home. They took her to her mother's home.

Dr. Glenn Robert Groben testified that he was a deputy medical examiner in Lubbock County. Dr. Groben performed the autopsy on the victim. The victim had injuries to his head and upper chest. The main injury was a laceration and contusion to the back of his head. The victim had a depressed skull fracture where the bone had been driven toward the center of his skull. This injury was consistent with a fall from the bridge and with the victim landing on his back. The victim's spine was broken in two places, and his spinal cord was torn in both places. He also had contusions on his brain and multiple skull fractures. On his left side, his ribs were fractured and had torn into his lungs. Dr. Groben testified that the large bruise across the victim's back appeared to be the area of impact. Dr. Groben concluded that the victim died as a result of injuries from the fall. Dr. Groben further testified that the victim was 5'10" tall and weighed 190 pounds. The victim tested "totally negative" for drugs and alcohol. He was of medium build and was fifty-one years old.

The last witness the State called was appellant. Appellant waived his rights under U.S. CONST. amend. V and agreed to be called as a witness for the State as a "tactical decision" out of a

concern that a directed verdict might be granted in favor of Boswell. The trial court thoroughly admonished appellant on the record.

Appellant testified that "no deal" was involved with his testimony and that he had elected for the jury to determine punishment in the event that the jury found him guilty. Appellant stated that he understood it was unusual for the State to call a codefendant as a witness, that he could have waited to testify after the State had rested, and that he chose to testify at that time because he wanted the jury to hear his story.

Appellant testified that he was sitting behind the driver in the car at the travel center. Boswell, Jennifer, Johnson, and McBride were in the car with him. Four of them had drunk a six-pack of tall boys. They were waiting on Boswell's girlfriend to get off work. Appellant testified that there were "some quite attractive looking ladies" in the car next to them. When appellant "let Mr. Boswell in on it," Jennifer got mad and started to argue with him. He knew that what he had said was "wrong" so he "sat there" and "took it."

The victim came out of the store. Appellant stated that he had seen the victim before and that "[e]veryone has seen him walking up and down Gregg Street." Jennifer told him, "That's the guy that threatened me and Hija." Appellant testified that "Hija" meant Jennifer's daughter. Appellant stated that he took it upon himself to "threaten the guy."

At first, Boswell would not let him out of the car. When he did, appellant "chased the guy." His only intentions "were just to threaten the guy." Appellant had his hands up in the air and was yelling. He was not aware that Boswell had followed him. The victim threw his hands up in the air, and appellant stated that he "took that as a confrontation." The victim kept walking, and appellant "chased" him.

Twice before they got to the bridge, appellant and the victim stopped and faced each other. Appellant testified that he threw up his hands and asked the victim, "What's up?" and "You like to beat on women. Why don't you try to beat on a man?"

Appellant caught the victim on the bridge. The victim was standing on the sidewalk, and appellant stated that that made the victim "look a lot bigger than" him. Appellant testified that he had already made a "butt" out of himself by confronting the victim and that he was "not going to back down from [the victim] after [appellant] had called him down." The victim reached back like

6

he had something in his hand.  Appellant testified that he thought about three times and then said, "The hell with it.  Let's get it on."

Appellant stepped up onto the sidewalk and lost his footing.  He fell down on all fours, and the victim grabbed him in a headlock.  Appellant testified that he had no idea what happened next. He was "laying on [his] butt on the road," and then Boswell was helping him up.  He had heard footsteps but did not know who it was.  He did not know if the victim jumped or if Boswell "clotheslined" him.  Appellant stated that Boswell was in the area when the victim jumped, fell, or slipped.  Appellant testified that he was twenty-eight years old and "about six foot" tall.

The State rested, and appellant testified in his own behalf.  Appellant testified that he had been friends with Boswell for about twelve years.  Boswell was like a brother to him, and it was "tough" to testify at this trial.  Appellant testified that he thought that the victim might have been pushed or "clotheslined."  Appellant testified that, if he was going to admit in his letters to Jennifer and to another girlfriend that he had pushed the victim over the bridge, he "would have pleaded guilty."  Appellant stated that in the letters he did not talk about pleading guilty but that he talked about a "deal" that had been brought to him.  Appellant stated that he did not say that he had pushed the victim over the bridge.

Appellant stated that he was the person who was angry with the victim, not Boswell.  Boswell had tried to stop him from confronting the victim.

On cross-examination, appellant testified that he and Boswell had been in fights together on many occasions and that "they covered each other's back."  Appellant stated that he had never had to help Boswell out because Boswell always "took care of his own."  Appellant stated that Detective Rider "had an attitude toward [him]" and that he had told Detective Rider that he had been at home all night making love to his girlfriend to get the detective "off" his back.

The jury, as the finder of fact, was the sole judge of the weight and credibility of the witnesses' testimony.  TEX. CODE CRIM. PROC. ANN. art. 36.13 (Vernon 2007), art. 38.04 (Vernon 1979).  The appellate court reviews the factfinder's weighing of the evidence and cannot substitute its judgment for that of the factfinder.  *Cain*, 958 S.W.2d at 407; *Clewis*, 922 S.W.2d at 133.  Due deference must be given to the factfinder's determination, particularly concerning the weight and credibility of the evidence.  *Johnson*, 23 S.W.3d at 9; *Jones v. State*, 944 S.W.2d 642 (Tex. Crim.

7

App. 1996). This court has the authority to disagree with the factfinder's determination "only when the record clearly indicates such a step is necessary to arrest the occurrence of a manifest injustice." *Johnson*, 23 S.W.3d at 9. We also note that circumstantial evidence of intent must be reviewed with the same scrutiny as any other element of the offense. *Laster*, 275 S.W.3d at 519-20.

When viewed in the light most favorable to the verdict, the evidence is legally sufficient to support the jury's determination that appellant committed the offense alleged. A rational factfinder could have reasonably concluded that appellant caused the victim's death. Likewise, when viewed in a neutral light, we find that the evidence is factually sufficient to support the verdict. As the factfinder, the jury observed the demeanor of each witness and could accept or reject any or all of a witness's testimony. Articles 36.13, 38.04; *see Marshall v. State*, 210 S.W.3d 618, 625 (Tex. Crim. App. 2006). The jury could have reasonably rejected appellant's testimony that he did not know what happened and accepted the testimony that appellant was seen on the bridge holding the victim by his shoulders. From the testimony describing the position of the victim on his back on the interstate highway below and over about a foot from the footprints on the bridge above and the testimony of the confrontation between appellant and the victim, the jury could have concluded that appellant caused the victim's death as alleged in the indictment. While the verdict is afforded less deference under a factual sufficiency review, the appellate court is not free to override the verdict simply because the appellate court may or may not agree with it. *Laster*, 275 S.W.3d 520. The evidence is not so weak that the verdict is clearly wrong and manifestly unjust, and the verdict is not against the great weight and preponderance of the conflicting evidence. The second and third issues are overruled.

*Joint Trial of Appellant and Dennis Boswell*

As stated above, both appellant and Boswell were indicted for the murder of the victim. Each indictment contained enhancement allegations. On appeal, appellant argues that, since both men had prior convictions, "the issue is one of prejudice to [appellant's] case." Appellant contends that he never asked Boswell to help and that his contact with the victim ceased before Boswell's contact began. Therefore, the denial of the severance prevented the jury from considering these scenarios separately.

In his motion to sever, appellant only argued that Boswell's prior conviction would be prejudicial and that a joint trial would cause "antagonistic defenses." Appellant did not present his argument that his conduct and Boswell's conduct were in fact two separate criminal episodes that could not be joined under TEX. PENAL CODE ANN. § 3.02 (Vernon 2003). Therefore, appellant has failed to preserve this complaint for appellate review. TEX. R. APP. P. 33. The record does not support appellant's complaints that the joinder resulted in prejudice to him. Appellant testified as to his prior convictions. Appellant has not established that the trial court erred. The first issue is overruled.

*Charge to the Jury*

*A. Boswell's Plea of Guilty.*

The jury began deliberations at 12:17 p.m. At 4:30 p.m., the jury sent the following note: "We have made a decision on one of the defendants. We remain in deliberation of the second, possibly deadlock." The trial court responded, "Thank you for your update. Please continue your deliberations." At 5:15 p.m., Boswell's attorney informed the trial court that Boswell had entered into a plea bargain agreement. Boswell agreed to plead guilty to the offense of manslaughter, and the State recommended incarceration for ten years. The trial court proceeded to discuss the situation with Boswell and to admonish him. The trial court then accepted Boswell's plea, convicted him of manslaughter, and imposed the recommended punishment of confinement for ten years.

The trial court then announced that it was sending a note to the jury stating, "You are hereby instructed that you should immediately terminate your deliberations as to the Defendant Dennis Boswell. If you have reached a verdict as to the Defendant Ramon Cisneros, you should notify the bailiff and then return into court with your verdict. Otherwise, please continue your deliberations." Appellant objected on the grounds that that would send a message to the jury that the State had dismissed the charges against Boswell. After some discussion, the trial court proposed bringing the jury into the courtroom to ask if the jury was still in agreement as to one defendant and, if so, ask as to which defendant the jury was in agreement. If the jury answered that appellant was the defendant about whom it agreed, then the trial court would instruct the jury to go back into the jury room and indicate to the bailiff that a verdict had been reached. The trial court asked appellant if there was "[a]ny problem with that." Appellant stated, "None."

9

The jury entered the courtroom at 5:55 p.m., and the trial court asked the presiding juror if the jury was still in concurrence on its decision as to one of the defendants. The presiding juror answered yes. The trial court asked if the jury was still in a deadlock as to the other defendant. The presiding juror answered yes. When the trial court asked which defendant the jury had reached a decision upon, the presiding juror answered that it was appellant. The trial court then instructed the jury to return to the jury room and, if it had not already done so, to prepare its verdict. The trial court further instructed the jury to knock on the door when it was finished, and at that time, the jury would be brought back into the courtroom so that the trial court could receive the jury's verdict as to appellant.

Appellant now complains of the very procedure to which he had agreed. Appellant's fifth issue presents nothing for appellate review. Rule 33. The fifth issue is overruled.

*B. Lesser Included Offenses.*

Appellant complains that the trial court erred in failing to include his requested submission on the lesser included offenses of aggravated assault and criminal negligent homicide. We disagree.

In determining whether the jury should be charged on a lesser included offense, a two-step analysis is applied. *Segundo v. State*, 270 S.W.3d 79, 90-91 (Tex. Crim. App. 2008); *Hall v. State*, 225 S.W.3d 524, 525 (Tex. Crim. App. 2007). The appellate court first considers the allegation in the indictment to decide if the offense is a lesser included offense of the charged offense and then examines the record for evidence from which a rational jury could acquit the defendant of the charged offense while convicting him of the lesser included offense. *Segundo*, 270 S.W.3d at 90-91.

As alleged in the indictment, both aggravated assault and criminal negligent homicide are lesser included offenses of murder. However, there is no evidence in the record upon which a rational jury might have acquitted appellant of murder while convicting him of either aggravated assault or criminal negligent homicide. Appellant's testimony was that he intended to only threaten the victim, that the victim was the aggressor who put a headlock on him forcing him to the ground on all fours and on his butt, and that Boswell had to pull him up off the ground. The requested charges were not supported by the evidence. Therefore, the trial court did not err. The sixth and seventh issues are overruled.

*C. Sudden Passion.*

In his fourth issue, appellant contends that the trial court erred by denying his request at the punishment phase for an instruction on the defense of sudden passion. We disagree.

TEX. PENAL CODE ANN. § 19.02 (Vernon 2003) defines the offense of murder and provides in relevant part:

> (d) At the punishment stage of a trial, the defendant may raise the issue as to whether he caused the death under the immediate influence of sudden passion arising from an adequate cause. If the defendant proves the issue in the affirmative by a preponderance of the evidence, the offense is a felony of the second degree.

Section 19.02(a) defines adequate cause as that cause that would commonly produce a "degree of anger, rage, resentment, or terror in a person of ordinary temper, sufficient to render the mind incapable of cool reflection." Section 19.02(a)(2) defines sudden passion as "passion directly caused by and arising out of provocation by the individual killed or another acting with the person killed which passion arises at the time of the offense and is not solely the result of former provocation."

Appellant did not sustain his burden of establishing that the victim provoked a degree of response that a person of ordinary temper would have acted as he did. He did not affirmatively establish either adequate cause or sudden passion as defined by Section 19.02. He did establish that he intended to threaten the victim because the victim had threatened Jennifer at sometime in the past. Therefore, the trial court did not err. *McKinney v. State*, 179 S.W.3d 565, 569 (Tex. Crim. App. 2005). The fourth issue is overruled.

*Holding*

The judgment of the trial court is affirmed.

RICK STRANGE

JUSTICE

August 28, 2009

Do not publish. *See* TEX. R. APP. P. 47.2(b).

Panel consists of: Wright, C.J.,
McCall, J., and Strange, J.

11