**TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN**

---

**NO.  03-21-00392-CR**

---

**D'Nerior Drew, Appellant**

**v.**

**The State of Texas, Appellee**

---

**FROM THE 426TH DISTRICT COURT OF BELL COUNTY**
**NO. 21DCR84204, THE HONORABLE STEVEN J. DUSKIE, JUDGE PRESIDING**

---

**M E M O R A N D U M   O P I N I O N**


A jury convicted D'Nerior Drew of two counts of aggravated robbery and two counts of engaging in organized criminal activity, and assessed punishment at 75 years' imprisonment for each count.  *See* Tex. Penal Code §§ 12.32, 29.03(a), 71.02.  Drew's first through fourth issues challenge the admission of four extraneous offenses.  Drew's fifth issue argues that the trial court should have granted a mistrial based on the State's argued reason for admitting the extraneous offenses being shown to be incorrect.  Because the trial court did not abuse its discretion in admitting the complained of evidence and because Drew has not preserved his fifth issue for appellate review, we will affirm.

# BACKGROUND

## *Suspicious Activity Prior to Charged Offenses*

About a week before the charged offenses occurred, Killeen Police Department officers responded to a call that two men in a blue Kia Sorento were going to rob the JLTD Sweeps Game Room. Even though no offense occurred at the scene, officers identified a car matching the description, noting that it appeared blue or gray, and identified the driver as Shaun Tennessee. Officers saw Drew picking up trash and then approach the car and remove the keys from the ignition.

## *The Charged Offenses*

### Lucky Winners/Gooch Robbery

Cassie Gooch testified that at about 6:25 am on October 21, 2020, she was robbed while working the end of her shift at Lucky Winners game room in Harker Heights, Texas. The game room was sparsely occupied when two men wearing hoodies and facemasks covering their mouths and partly covering their noses entered the game room while Gooch was behind the counter. One of the men came behind the counter while his taller accomplice remained on the other side of the counter. Gooch was given two notes, which were admitted into evidence: one written by one of the robbers that read "money now," and one written at the direction of the robbers by a man who had entered the game room an hour before, Robert Esteves, that read, "$2,500 every 2 weeks or wont stop." Gooch noticed that one robber had a cross tattoo in the middle of his forehead, and she immediately identified him as Drew whom she had met before. Drew pointed a gun at Gooch through the pouch in his hoodie and the other robber had his hand on a gun on the counter pointed at her. Gooch addressed Drew saying, "Scooter, really?", after which, the robbers

2

became agitated and the taller one threw a purse on the floor behind the counter. Esteves told her to do as the robbers said. Neither robber spoke. There were approximately one hundred dollars remaining in the register that the robbers stole.

About a week later, Gooch identified Drew in a photo lineup as one of the robbers. During a subsequent interaction with Drew, he told her that "he should off [her] right there" and told her to tell the police she lied about the robbery.

Next Level Sweeps/Gillon Robbery

Within thirty minutes of the Gooch robbery, a second robbery occurred at the Next Level Sweeps game room in Killeen, Texas. Dazreana Gillon testified that she was about thirty minutes into her shift when a customer, Tim Cordova, entered, looked around, and left about ten minutes later. Gillon was alone in the game room. Less than ten minutes later, a man entered the game room and when Gillon asked for his name, she could not understand him due to him mumbling his response. Gillon looked up and saw a person wearing a mask who had his hand on the counter with a gun in the sleeve of his oversized jacket. After he threw the purse on the counter and said, "Hurry up," Gillon, emptied all five of the registers into the purse.

A video of the Gillon robbery was admitted into evidence and played for the jury. The video showed the robbery take place as described by Gillon. The video also showed Cordova entering a vehicle after his game session and using a phone shortly before the robbery occurred. A witness in the parking lot, Debra Reese, testified that she saw the robber emerge from the passenger side of a gray or silver SUV, rob the game room, and then flee in the SUV. Reese told Cordova, who was still in the parking lot during the robbery, to intervene. As the robber was leaving, Cordova pointed a gun at him, but the robber simply continued walking. Cordova left and

3

Reese stayed to comfort Gillon. Reese was not able to get a good look at either the driver or the passenger.

The admitted video showed Cordova holding a gun and confronting the robber in the doorway and the robber walking past him and fleeing in a vehicle. It also showed Cordova leave the scene and Reese go inside the game room with Gillon.

Gillon testified that Cordova did not return to Next Level for about two months, which was unusual for him. One week after the robbery, Gillon was shown a photo lineup and identified the robber as Drew with "85 percent confidence," based on his skin tone, "some of the hair features," and his eyes.

### Drew's Arrest

Drew was arrested about two weeks later. His cross tattoo between his eyes was not visible until an officer shined a light on it to reveal a light-in-color marking. The officer wiped Drew's forehead, which revealed the cross tattoo that had been covered up with makeup. Drew was mumbling and difficult to understand. Police found a gun in the apartment into which Drew ran just prior to his arrest. The recovered gun had the same "silver or chrome discoloration" seen in the Gillon robbery video.

### Cross-Examination of Gillon

When cross-examining Gillon, Drew's attorney questioned her about whether she got a good look at the robber's hands and she responded, "not really" and agreed that she was focused on the gun. He asked her if she had noticed tattoos on the hands of the robber and she responded that she did not. He asked her if she could see any tattoos on the robber's hands or wrists in the surveillance video, and she responded she did not. Defense counsel had Drew stand

4

in front of the jury and display his hands to them as the video of the offense was played. Defense

counsel then cross-examined Gillon regarding her "85 percent" identification of Drew and

regarding her failure to mention his tattoos in her statement. Gillon explained, that she was focused

on the gun. On redirect, Gillon opined that if tattoos are faint they may not show on video even if

they are visible in person.

### Cross Examination of Detective Kashimura

Drew also cross-examined Detective Tomonari Kashimura about the lack of any

mention of the robber's tattoos in his report. Detective Kashimura testified that he did not include

anything in his report about tattoos, but that he remembered that Gillon told him the robber had

tattoos on the tops of his hands.

### The Extraneous Offenses

The State moved to introduce four extraneous offenses to prove Drew's identity as

the robber. The trial court overruled Drew's objections, and gave a limiting instruction in the jury

charge:

> The defendant is on trial solely on the charges contained in the indictment. In reference to evidence, if any, that the defendant has previously participated in recent transactions, acts, or offenses, other than but similar to that which is charged in the indictment in this case, you are instructed that you cannot consider such other transactions, acts, or offenses if any, for any purpose unless you find and believe beyond a reasonable doubt that the defendant participated in such transactions or committed such acts or offenses, if any; and even then you may only consider the same for the purpose of proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident of the defendant, in connection with the offense alleged against him in the indictment in this case, and for no other purpose.

5

The State then introduced evidence of three extraneous robberies and one extortion attempt through witness testimony. Additionally, the State presented the judgment of conviction from one of the extraneous robberies in which Drew pleaded guilty and presented his signed motion admitting guilt in another of the extraneous robberies that was considered as part of that guilty plea.

First Lucky Lounge/Robbins Robbery

Carol Robbins testified that on November 23, 2018, Thanksgiving morning, she was robbed at gunpoint while working at the Lucky Lounge game room in Austin. The robber was wearing a hoodie with the hood on and a black "whole-head mask." He had tattoos on his hands, neck, and face, which included a cross tattoo between his eyes on his lower forehead. She recognized the robber as a customer named John Drew or Scooter, which were known aliases of Drew, based on eyes and his deep, low, and mumbling voice. The morning of the robbery was slow after being busy overnight. While Robbins was helping a customer, Drew came behind the counter, put a gun in her side, and demanded money by saying, "be quiet and give me the money," which she gave him. During her testimony she identified Drew as the robber.

Through the State's expert witness, Karl Otiz, a criminal investigator with the Bell County District Attorney's Office, the State presented documentary evidence that Drew had admitted guilt to this offense as part of his guilty plea entered for the second robbery of Lucky Lounge.

Second Lucky Lounge/Tuto Robbery

On December 4, 2018, Lucky Lounge was robbed again. Tyann Tuto testified that she was robbed shortly before 7 pm by a person with a "big reggae hat on with a big hoodie" partially covering his face. There was also a well-dressed man whose face was not concealed, who

6

handed Tuto $25 to play a game, but would not give his name. While Tuto assisted the well-dressed man, the man in the hoodie checked the rooms as if to see who was there. The hooded man moved behind Tuto and the register and screamed for the well-dressed man to give Tuto his name, then ordered her to get on the ground. He pushed her into the corner. The well-dressed man "was at the vending machines and walking around and not trying to help in any kind of way." The hooded man demanded money from the register while having his fingers in his pockets in a way that suggested he might have a gun. Tuto tased him and he fled with about one thousand dollars. Tuto recognized this robber as "John Drew," based on a prior incident and her knowledge of the gaming industry. Tuto described Drew, or Scooter, as having a cross tattoo on his forehead as well as tattoos on his hands.

During her testimony the State showed her photographs from the robbery, and Tuto stated she could not see tattoos in the photographs but did see them in person. On cross-examination, Drew's attorney had her approach the exhibits, and she acknowledged she could "barely" see "discoloration in the hands," agreeing that there were tattoos. On redirect she noted she could not see all of Drew's tattoos in the photograph, how many there are, or what they look like. Tuto identified Drew as the robber in court.

The State presented documentary evidence through its expert witness Otiz that on February 4, 2020, Drew pleaded guilty to this offense and was sentenced to seven years' imprisonment, which was suspended, and he was placed on community supervision for seven years.

Venom Vapors/Johnson Robbery

Tonya Johnson testified that on October 18, 2020—almost two years after the Lucky Lounge robberies and three days prior to the charged offenses—she was working at Venom Vapors,

7

a vape store and game room in Killeen, Texas, when it was robbed. It was a slow Sunday with just one customer. Then a man approached her, pulled a gun out, laid it flat on the counter with his hand on top of it, and demanded money from both cash registers. Johnson testified that she was focused on the gun because she was concerned his finger was on the trigger, that she did not know what could happen, and that she was concerned for the safety of her adult child that was sitting at the other register. Johnson handed him the money from the register. The robber was a black male, "on the shorter side," wearing a hoodie and a mask and looking down. She had difficulty understanding what he said based on how he spoke—slow and "not normal." The man left with over eight hundred dollars. She was not able to identify him. However, Kyle Brown, the owner of Venom Vapors, testified that he later met with Drew who he identified in court, and testified that Drew had a similar distinctive gait to the robber based on the surveillance video depicting the robbery. The surveillance video also showed that another person was in the car in which the robber arrived.

Extortion of Venom Vapor's Owner

Brown testified that a few days after the Venom Vapors robbery, he began receiving phone calls informing him that he needed "to pay money in order to stay in business . . . and not be robbed again." The caller was initially difficult to understand, and Brown believed he was using "voice scrambler disguising mechanisms on the phone."

Brown met seven times in person with Drew, who referred to himself as Scooter. Drew initially wore a cloth mask covering his face, but then met without a mask. Brown identified Drew in court. Brown described his speech as very mumbled and difficult to understand. Drew told Brown that if he paid $1,500 per week, he would ensure Brown was not robbed again. Drew also told him that he did not rob him but knew who did and who was extorting him and would

8

make sure the money got to them. However, Brown testified that he had noticed while downloading the surveillance video for the police that Drew and the Venom Vapors robber both had a similar distinctive gait. The surveillance video depicting the robber walking into Venom Vapors was played for the jury.

After considering the evidence presented at trial, the jury found him guilty of two counts of aggravated robbery and two counts of engaging in organized criminal activity and assessed punishment at 75 years' imprisonment for each count.

## DISCUSSION

In his first four issues on appeal, Drew asserts that the extraneous offense evidence was inadmissible under Rules of Evidence 404(b) and 403. In his final issue on appeal, Drew argues that the trial court erred by denying his motion for mistrial after the State's proposed basis for the identification proved false.

*Extraneous Offense Evidence*

We review a trial court's admission of evidence for an abuse of discretion. *Sandoval v. State*, 409 S.W.3d 259, 297 (Tex. App.—Austin 2013, no pet.). A trial court abuses its discretion only if its ruling lies outside the zone of reasonable disagreement. *Id.* Reversal under this standard requires more than solely disagreeing with the trial court's ruling. *Powell v. State*, 63 S.W.3d 435, 438 (Tex. Crim. App. 2001). An evidentiary ruling will be upheld if it is correct on any theory of law applicable to the case. *Sandoval*, 409 S.W.3d at 297.

*Rule 404*

In the first part of his first four issues on appeal, Drew asserts that evidence of the extraneous robberies and extortion attempt was inadmissible under Rule of Evidence 404(b)

9

because: (1) identity was not sufficiently raised by the defense; and (2) the extraneous offenses were not sufficiently similar to the charged offenses. Drew also argues the State did not prove beyond a reasonable doubt that Drew committed the Johnson robbery.

"Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Tex. R. Evid. 404(b)(1). However, such evidence "may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." *Id.* R. 404(b)(2). Identity must be an issue in the case to allow admittance of extraneous offenses for the purpose of proving identity. *Page v. State*, 137 S.W.3d 75, 78 (Tex. Crim. App. 2004).

"Identity can be raised by defense cross-examination, such as when the identifying witness is impeached on a material detail of the identification." *Id.* In this context, "material," means "relevant to the reliability of the identification." *Id.* at 79 ("That the impeachment was not particularly damaging or effective in light of all the evidence presented is not the question."). If impeachment occurred that raised the issue of identity, then Rule 404(b) permits the introduction of extraneous offenses relevant to the issue of identity. *Id.* "For instance, the issue of identity is raised when the State's only identifying witness is impeached by cross-examination concerning a material detail of the witness' identification." *Lane v. State*, 933 S.W.2d 504, 519 (Tex. Crim. App. 1996). "The trial judge has considerable latitude in determining that identity is, in fact, disputed." *Segundo v. State*, 270 S.W.3d 79, 86 (Tex. Crim. App. 2008).

When the defense puts identity in issue, the State may offer extraneous-offense evidence to prove identity, including evidence "of *modus operandi* in which the pattern and characteristics of the charged crime and the uncharged misconduct are so distinctively similar that

10

they constitute a 'signature.'" *Segundo*, 270 S.W.3d at 88. There are no rigid rules for what constitutes sufficient similarities to be admissible, but they may include common characteristics such as "proximity in time and place, mode of commission of the crimes, the person's dress, or any other elements which mark both crimes as having been committed by the same person." *Id.* Sometimes one unique characteristic can create a "signature" that ties crimes to each other—"'the mark of Zorro' mode of proving identity." *Id.* However, only generic similarities or only those typical to the type of crime, do not constitute a "signature." *Id.*

Identity at issue

Drew argues that identity was not an issue because Gillon was not impeached and that the question about the tattoos on the robber's hand related only to the video and not to Gillon's identification at the time of the robbery. Drew argues that the witness was not impeached because she testified that the tattoos may have been difficult to see on surveillance and because Detective Kashimura testified that Gillon told him about the tattoos. The State argues that Drew's cross-examination of the sole identifying witness in the Gillon robbery on whether she noticed tattoos on the robber's hands during the robbery and whether she could see them in the video (to which she answered negatively), cross-examining Detective Kashimura on whether he included mention of tattoos in his report (which he did not), and having Drew stand and display his tattoos to the jury, placed identity at issue.

Identity can be raised when trial counsel engages in activity that amounts to an equivalent of testimony that impeaches the identification of a defendant. *Siqueiros v. State*, 685 S.W.2d 68, 72 (Tex. Crim. App. 1985); *Walker v. State*, 588 S.W.2d 920, 923 (Tex. Crim. App. 1979) (holding that defense counsel asking identifying witness if she noticed any tattoo or scars

11

on her assailant, then when she responded negatively, having defendant stand up to display his scars and tattoos raised identity issue).

Here, defense counsel asked the sole identifying witness in the Gillon robbery if she saw tattoos at the time of the robbery or on the surveillance video, then after she responded that she did not, had Drew stand before the jury and display his tattoos. The trial court's determination that identity was an issue was not outside the zone of reasonable disagreement. *See Segundo*, 270 S.W.3d at 86 ("The trial judge has considerable latitude in determining that identity is, in fact, disputed.").

Similarities to the charged offenses

Drew argues that none of the extraneous offenses have sufficient similarities to be a "signature," but rather only share characteristics of aggravated robberies in general. The State asserts that the robbery offenses are sufficiently similar because all involved: (1) a game room; (2) a gun; (3) similar attire[1]; (4) a robber who had either a distinctive cross tattoo or mumbled or both; (5) and female victims. The State also argues that in four of the five offenses the robber was identified as "Scooter," a known nickname used by Drew. The State also points out that except for the Robbins robbery, the other four involved at least two people working together. The State also argues that the extraneous extortion offense shared with the Gooch offense the demand to be given money at regular intervals. For the reasons discussed below, we agree with the State that the similarities among all of the extraneous offenses support that the trial court's admission of the

---

[1] The State argues that this applies to all extraneous robberies except the Johnson robbery. However, the record reflects that witnesses testified that the robber wore a hoodie, or oversized jacket, in all of the robberies, and that except the Tuto robbery testified that the robber wore a mask of some kind.

12

offenses is within the zone of reasonable disagreement and not an abuse of discretion. *See Sandoval*, 409 S.W.3d at 297.

*Robbins Robbery*

In both the Robbins and Gillon robberies there was one robber who mumbled, wore a hoodie and a mask covering at least part of his face, had a gun in his hand, and demanded cash from cash registers at games rooms that were being staffed by female employees who were behind the counter while the establishment was sparsely occupied. In both the Robbins and Gooch robberies the robbers wore face masks and hoodies and stole cash from cash registers at game rooms that were being staffed by female employees who were behind the counter while the establishment was sparsely occupied. Additionally, a robber at both the Robbins and Gooch robberies had a distinctive cross tattoo low on his forehead between his eyes. Further, Drew was recognized at both the Robbins and Gooch robberies by the employee being robbed.

Although Drew focuses on the differences between the two charged offenses and the Robbins robbery, the distance between Austin, Texas and Killeen, Texas, and the remoteness in time of almost two years, the differences do not undermine the similarities that support the district court's ruling. *Lewis v. State*, 674 S.W.2d 423, 427 (Tex. App.—Dallas 1984, pet. ref'd) (holding two years between offenses "not so remote as to render them inadmissible" and noting that "proximity in time is but one factor to be considered in determining the admissibility of extraneous offenses"). The similarities were not only those typical to aggravated robberies. Rather, they work together to form a "signature" between the extraneous offense and the charged offenses. *See Segundo*, 270 S.W.3d at 88.

*Tuto Robbery*

The Tuto, Gillon, and Gooch robberies were all committed by a robber in a hoodie and some type of accessory that assisted in covering his face—a reggae hat in the Tuto robbery and a mask in the Gillon and Gooch robberies. All robberies also included a suspicious additional individual. In the Tuto robbery there was a well-dressed man who held Tuto's attention while the robber cased the scene and made his way behind the counter. He made no attempt to assist her nor otherwise react to the robbery. Just prior to the Gillon robbery, Cordova entered, left, made a phone call, only then attempting to intervene in the robbery after being directed to by Reese, the witness in the parking lot, and then left the scene and did not return for an amount of time that was unusual for him. At the Gooch robbery, Esteves entered an hour before the robbery, wrote the note at the direction of the robbers that read, "$2,500 every 2 weeks or wont stop," and told Gooch to do as the robbers told her. Further, all three robberies were of game rooms that were staffed by female employees behind the counter and cash was stolen out of the cash registers. Further, in both the Tuto and Gillon robberies the robber used a hoodie to conceal the gun. In the Tuto robbery, the gun was inside a pocket of his hoodie, and in the Gillon robbery it was inside his oversized jacket sleeve.

Although Drew focuses on the differences among the two charged offenses and the Tuto robbery, the distance between Austin and Killeen, Texas, and the remoteness in time of almost two years, the differences do not undermine the similarities that support the district court's ruling. *See Lewis*, 674 S.W.2d at 427. The similarities were not only those typical of aggravated robberies but rather work together to form a "signature" among the extraneous offense and the charged offenses. *See Segundo*, 270 S.W.3d at 88.

14

*Johnson Robbery*

The Johnson robbery is similar to both the Gooch and Gillon robberies in that all three were robberies of a game room during a period of slow business while a female employee was behind the counter. Also, in all three cash was stolen from cash registers by at least one robber who wore a hoodie and a mask. Additionally, at least one robber in each offense placed a gun on the counter, and the Johnson robbery occurred only three days prior to the two charged offenses. Additionally, both the Johnson and Gillon robberies involved one robber who was hard to understand and a getaway driver.

Although Drew focuses on the differences among the two charged offenses and the Johnson robbery, the differences do not undermine the similarities that support the district court's ruling. *See Alexander v. State*, No. 2-01-349-CR, 2003 WL 300246, at *4 (Tex. App.—Fort Worth Feb. 13, 2003, pet. ref'd) (holding extraneous offense admissible when committed within one week of charged offense and noting that "crimes which occur in close temporal proximity to each other might not have to be as similar as crimes committed at more remote periods of time from each other"). It was not an abuse of discretion for the district court to find that the similarities were not only those typical of aggravated robberies but rather work together to form a "signature" among the extraneous offense and the charged offenses. *See Segundo*, 270 S.W.3d at 88.

Drew also argues that the State did not establish beyond a reasonable doubt that Drew committed the Johnson robbery. *Harrell v. State*, 884 S.W.2d 154, 161 (Tex. Crim. App. 1994) ("[I]n order for the evidence to have been sufficient for the trial court to admit it, it had to determine that a jury could find beyond a reasonable doubt that appellant committed the extraneous offenses . . . ."). As relevant here, a person commits aggravated robbery if in the course of committing theft, and with intent to obtain or maintain control over property, intentionally or

15

knowingly threatens or places another in fear of imminent bodily injury or death and uses or exhibits a deadly weapon during the commission of the offense. Tex. Penal Code § 29.03(a)(2). Here, Johnson testified that the robber presented a gun, demanded money, and stole over eight hundred dollars from the cash registers. She testified that she was focused on the gun because she was concerned his finger was on the trigger, that she did not know what could happen, that she was concerned for the safety of her adult child that was sitting at the other register, and that she gave him the money. The owner of Venom Vapors testified that he met with Drew in person seven times and that Drew's distinctive gait was similar to how the robber walked in the surveillance video of the Johnson robbery, and both Drew and the robber were difficult to understand. Further, Drew knew about the robbery, initiated contact with the owner after the robbery, initially wore a mask while speaking to the owner in person, and assured the owner that he would get the extortion money to the people who robbed him—despite saying he was not the robber. It was not an abuse of discretion for the district court to find that the jury could reasonably find beyond a reasonable doubt that Drew committed the Johnson robbery. *See Harrell*, 884 S.W.2d at 160; *see also Segundo*, 270 S.W.3d at 88.

*Extortion Scheme*

The extortion scheme and the Gooch robbery both included an attempt to convince a person associated with operating a game room to pay a specified amount of money on regular intervals to someone who had robbed that game room in order to prevent future robberies to that same establishment. The two extortion attempts—the one that was part of the Gooch robbery and the stand-alone attempt—occurred about a week apart. The extortion attempts were directly connected with the robbery of the same establishment—either occurring simultaneously in the

16

Gooch robbery or soon after in the extraneous extortion offense. Also, both were accompanied by promises that further robberies would be prevented if the money was paid, but that more robberies would occur if the demand was not met. It was not an abuse of discretion for the district court to find that these common characteristics are more than only typical of the offense, but rather form a "signature" between the extraneous offense and the charged offenses. *See Segundo*, 270 S.W.3d at 88; *see also Alexander*, 2003 WL 300246, at *4 (holding extraneous offense admissible when committed within one week of charged offense and included similar threatening language).

*The Extraneous Offenses Were Sufficiently Similar*

In sum, the two charged offenses and the three extraneous robberies, all included a robbery of a game room while business was slow and the establishment was staffed by a female employee behind a counter who was directed at gun point to empty the cash registers of cash. As detailed above, additional similarities also exist between specific offenses. Further the extortion attempt and the Gooch robbery both involved an extortion attempt of a game room for regular payments at specified intervals directly related to a robbery of that same establishment under threat of future robberies and occurred close in time. Because the district court's ruling on admissibility of the extraneous offenses is not outside the zone of reasonable disagreement, the district court did not abuse its discretion when it allowed their introduction. *See Sandoval*, 409 S.W.3d at 297; *see also Hill v. State*, No. 01-16-00595-CR, 2017 WL 2290201, at *5 (Tex. App.—Houston [1st Dist.] May 25, 2017, pet. Ref'd) (mem. op., not designated for publication) (concluding that extraneous offense was sufficiently similar where robberies occurred within one day of each other, where robberies were committed "in the Houston metropolitan area," where robberies "occurred at a gas station with a convenience store," where robbers wore masks, where robbers "demanded money

17

at gunpoint from the cashiers," where robbers used "black handgun," and where robbers wore dark hoodie, baseball cap, and "a black mask").

***RULE 403***

Drew also alleges in his first through fourth issues that the district court erred when it overruled his Rule 403 objections and allowed the State to introduce evidence of the extraneous offenses.

Texas Rule of Evidence 403 provides that even relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury; by considerations of undue delay; or by needless presentation of cumulative evidence. *See* Tex. R. Evid. 403. "Under Rule 403, it is presumed that the probative value of relevant evidence exceeds any danger of unfair prejudice. The rule envisions exclusion of evidence only when there is a clear disparity between the degree of prejudice of the offered evidence and its probative value." *Hammer v. State*, 296 S.W.3d 555, 568 (Tex. Crim. App. 2009) (footnotes and internal quotation marks omitted). Accordingly, "the plain language of Rule 403 does not allow a trial court to exclude otherwise relevant evidence when that evidence is merely prejudicial. Indeed, all evidence against a defendant is, by its very nature, designed to be prejudicial." *Pawlak v. State*, 420 S.W.3d 807, 811 (Tex. Crim. App. 2013) (internal citation omitted). A Rule 403 analysis generally includes balancing the following non-exclusive factors: (1) the probative value of the evidence; (2) the potential to impress the jury in some irrational, but lasting way; (3) the time needed to develop the evidence; and (4) the proponent's need for the evidence. *Colone v. State*, 573 S.W.3d 249, 266 (Tex. Crim. App. 2019).

18

The evidence of the extraneous robberies and extortion attempt was highly probative. *See Johnson v. State*, 68 S.W.3d 644, 651 (Tex. Crim. App. 2002) ("The extraneous offenses were highly probative because. . . they tended to prove appellant's identity as the perpetrator"). As discussed above, they contained sufficient common characteristics with the charged offenses to suggest that Drew committed each offense. *See Clifford v. State*, 653 S.W.3d 1, 10 (Tex. App.—Austin 2022, pet. ref'd) (noting that probative value of extraneous offenses weighed in favor of admission where there were significant similarities between extraneous offense and charged one). Even if, as Drew argues, this factor is affected by the two victims of the charged robberies identifying Drew as the robber, this factor still weighs in favor of admissibility. Drew raised the issue of identity on cross-examination of Gillon when his counsel pointed out that she only identified him with "85 percent confidence" and had Drew stand in front of the jury displaying his tattoos after eliciting testimony from Gillon that she didn't notice tattoos on his hands during the robbery or see them in the video. The first factor favors admissibility.

As for the potential of the evidence to impress the jury in an irrational, lasting way, the evidence of the extraneous offenses was no more inflammatory than the charged offenses. *See, e.g., Taylor v. State*, 920 S.W.2d 319, 323 (Tex. Crim. App. 1996) (observing that "the first murder, being no more heinous than the second, was not likely to create such prejudice in the minds of the jury that it would have been unable to limit its consideration of the evidence to its proper purpose"). Drew argues that the admission of the extraneous offense evidence allowed the State to argue that Drew was orchestrating a robbery spree and extortion scheme. However, the charged offenses alone support such a narrative. The charged offenses were committed within thirty minutes of each other, Drew was linked to suspicious activity at a game room one week prior to the incident, and a note reading "$2,500 every 2 weeks or wont stop," was presented to Gooch during that

19

robbery. Drew also argues that the Robbins and Tuto robberies were more egregious than the charged offenses because they included physical contact. However, Gooch testified that at some point during the days following the robbery Drew told her that "he should off [her] right there," and told her to tell the police she lied about the robbery. The increased proximity to the victims during the Robbins and Tuto robberies was not more inflammatory than Drew threatening to kill a witness if she did not lie to police. Moreover, the trial court included an instruction in the jury charge explaining that the jury could only consider evidence of other crimes, wrongs, or acts if it first determined beyond a reasonable doubt that those offenses had occurred and only for limited purposes, including establishing identity. *See Beam v. State*, 447 S.W.3d 401, 405 (Tex. App.— Houston [14th Dist.] 2014, no pet.) (noting that "the impermissible inference can be minimized through a limiting instruction"); *see also Gaytan v. State*, 331 S.W.3d 218, 228 (Tex. App.—Austin 2011, pet. ref'd) (stating that appellate courts "presume that the jury obeyed" limiting instructions). This second factor favors admissibility.

Moving next to the time needed to develop the evidence, the State called several witnesses who testified only about the extraneous offenses. The State's development of the extraneous offenses took about thirteen percent of the guilt-innocence portion of the trial based on the number of pages in the Reporter's Record. That is not an "inordinate" amount of time in this case. *See Cain v. State*, No. 03-19-00829-CR, 2021 WL 1773510, at *6 (Tex. App.—Austin May 5, 2021, no pet.) (mem. op.) (one-fourth of State's case was not inordinate amount of time); *Caston v. State*, 549 S.W.3d 601, 613 (Tex. App.—Houston [1st Dist.] 2017, no pet.) (one-fourth of trial was not inordinate amount of time.). This factor therefore points in favor of admissibility. Next, we examine the State's need for the evidence. In deciding whether the evidence was needed, courts should consider whether the proponent had other evidence to establish the fact of

20

consequence, how strong the other evidence was, and whether the "fact of consequence related to an issue that is in dispute." *See Erazo v. State*, 144 S.W.3d 487, 495–96 (Tex. Crim. App. 2004) (quoting *Montgomery v. State*, 810 S.W.2d 372, 390 (Tex. Crim. App. 1991) (op. on reh'g)). The State's need was high as it was required to prove Drew's identity as the robber in the charged offenses. As discussed above, Drew challenged the identity of the robber in the Gillon robbery by asking the only identifying witness about tattoos of the robber, whether tattoos could be seen on the surveillance video, and by standing before the jury displaying his tattoos. The State needed evidence of the extraneous offenses as identity evidence in the face of Drew's defense. *See Karnes v. State*, 127 S.W.3d 184, 193–94 (Tex. App.—Fort Worth 2003, pet. ref'd). The fourth factor favors admissibility.

Given these factors, the trial court reasonably could have concluded that the danger of unfair prejudice from admitting evidence about the extraneous offenses did not substantially outweigh that evidence's probative value. Tex. R. Evid. 403. The trial court thus did not abuse its discretion by admitting evidence of the extraneous offenses over the Rule 403 objection. *See Sandoval*, 409 S.W.3d at 297. We overrule Drew's first through fourth appellate issues as they relate to his Rule 403 complaint.

*Motion for Mistrial*

Drew argues that the trial court erred by denying his motion for mistrial after the State's proposed basis for the identification proved false. The State argues that Drew failed to preserve any error on this issue because although he moved for mistrial three times, he never moved for mistrial on the ground he raises here. *See* Tex. R. App. P. 33.1(a)(1).

First, as the State correctly pointed out, Drew has not provided any citation to the record for where he raised this ground before the trial court, and thus, he has not briefed the motion

21

for mistrial presented in accordance with our briefing rules. *See* Tex. R. App. P. 38.1(i) ("The brief must contain a clear and concise argument for the contentions made, with appropriate citations to authorities and to the record."). Second, a review of the record reveals that although Drew made three motions for mistrial, none of them comport with the ground he raises here—that the State's proposed basis for identification proved false. At trial Drew moved for mistrial based on an alleged misstatement of the law regarding self-incrimination by the State during voir dire and moved for mistrial twice on alleged discovery violations by the State. During argument by defense counsel on Drew's third motion for mistrial, the following exchange regarding the identity issue occurred:

> MR. OPARA: Judge, this goes on to the identity issue we talked about earlier. The witness over here testified that she saw no tattoos at all. And there's a tattoo there. That doesn't change. There was no identity issue to begin with. Had we had—

> THE COURT: Well, keep in mind the identity issue as to how it relates to these extraneous or other offenses has to do with identity of the current offense that being raised, not the identity in the old offense. So let's keep that in mind.

However, no motion for mistrial on this mentioned identity issue was made, and no adverse ruling was obtained to preserve error. Tex. R. App. P. 33.1(a)(1), (b)(2). Thus, because the complaint on appeal does not comport with any of the mistrial grounds presented at trial, nothing is presented for review. *See Hallmark v. State*, 541 S.W.3d 167, 171 (Tex. Crim. App. 2017); *see also Darcy v. State*, 488 S.W.3d 325, 327 (Tex. Crim. App. 2016) (noting that preservation of error is systemic requirement on appeal); *Blackshear v. State*, 385 S.W.3d 589, 591 (Tex. Crim. App. 2012) (observing that reviewing courts should not address merits of issue that has not been preserved for appeal). We overrule his fifth issue.

## CONCLUSION

Because we overrule all of Drew's appellate issues, we affirm the trial court's judgment of conviction.

_____

Gisela D. Triana, Justice

Before Justices Baker, Triana, Jones*

Affirmed

Filed:   March 31, 2023

Do Not Publish

* Before J. Woodfin Jones, Chief Justice (Retired), Third Court of Appeals, sitting by assignment. *See* Tex. Gov't Code § 74.003(b).

23